# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MSP RECOVERY CLAIMS SERIES, LLC; MSPA CLAIMS 1, LLC; MAO-MSO RECOVERY II, LLC, SERIES PMPI; SERIES 44, MSP RECOVERY CLAIMS PROV, SERIES LLC; and MSP RECOVERY CLAIMS CAID, SERIES LLC, individually and on behalf of all others similarly situated, | **Case No.:** 2:22-cv-1293 <br><br> **MDL No. 3014** <br><br> **CLASS ACTION COMPLAINT FOR ECONOMIC LOSSES** |
| Plaintiffs, | |
| v. | |
| KONINKLIJKE PHILIPS N.V., PHILIPS NORTH AMERICA LLC, PHILIPS HOLDING USA INC., PHILIPS RS NORTH AMERICA LLC, and PHILIPS RS NORTH AMERICA HOLDING CORPORATION, | |
| Defendants. | |

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ............................................................................................. i

I.    NATURE OF THE ACTION ............................................................................ 1

II.   THE PARTIES................................................................................................. 5

     A.    PLAINTIFFS ......................................................................................... 5

     B.    DEFENDANTS .................................................................................... 10

III.  JURISDICTION AND VENUE ..................................................................... 12

IV.  FACTUAL ALLEGATIONS ......................................................................... 13

     A.    CPAP AND BIPAP MACHINES AND VENTILATORS ARE PRESCRIBED
          TO TREAT BREATHING DISORDERS ........................................... 13

     B.    PHILIPS SOLD CPAP, BIPAP, AND VENTILATOR DEVICES CONTAINING
          PE-PUR FOAM ................................................................................... 16

     C.    PHILIPS KNEW OF THE DANGERS OF PE-PUR FOAM SINCE AT LEAST
          2015..................................................................................................... 19

          1.    In 2015, Philips Communicated with Its Foam Suppliers about the
               Problem of PE-PUR Foam Degradation .................................. 24

          2.    Philips Opened an Internal Investigation into Foam Degradation in Mid-
               2018 that Confirmed PE-PUR Foam Is Prone to Degradation ................ 27

          3.    Philips Finally Opened a Formal CAPA in 2019 – But Did Not Initiate a
               Recall for Two More Years ....................................................... 33

     D.    UNTIL THE RECALL, PHILIPS ADVERTISED ITS BREATHING
          MACHINES AS SAFE AND EFFECTIVE ........................................ 35

     E.    PHILIPS BELATEDLY RECALLED ITS DEFECTIVE DEVICES
          CONTAINING PE-PUR FOAM DUE TO THE SERIOUS HEALTH HAZARDS
          THAT THEY CAUSE ........................................................................ 36

          1.    In April and May 2021, Philips Launched the DreamStation 2 and Tried to
               Convince Patients to Buy It, without Initiating a Recall .......................... 36

          2.    In June 2021, Philips Finally Recalled Its Defective Devices ................. 38

     F.    PHILIPS' INEFFECTIVE MEASURES TO RECALL THE DEVICES ........... 46

          1.    Many Patients, Providers, Third-Party Payors, and Others Were Not
               Notified about the Recall ........................................................... 46

          2.    Philips' Repair/Replacement Program Has Been Extremely Slow .......... 48

V.   CLASS ALLEGATIONS ............................................................................... 50

VI.  EQUITABLE TOLLING OF STATUTES OF LIMITATIONS ...................................... 55

VII. CAUSES OF ACTION ................................................................................... 55

i

VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT
ORGANIZATIONS ACT, 18 U.S.C. § 1962(C), AGAINST PHILIPS AND
POLYTECH ........................................................................................ 55

VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT
ORGANIZATIONS ACT, 18 U.S.C. § 1962(D), AGAINST PHILIPS AND
POLYTECH ........................................................................................ 79

BREACH OF EXPRESS WARRANTY ........................................................ 82

BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY ................... 83

BREACH OF THE IMPLIED WARRANTY OF USABILITY ...................................... 85

VIOLATIONS OF MAGNUSON-MOSS FEDERAL WARRANTY ACT ................... 86

COMMON LAW FRAUD ....................................................................... 88

UNJUST ENRICHMENT (IN THE ALTERNATIVE) ................................................. 91

VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW ................... 92

VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW ................... 95

VIOLATIONS OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT ..... 96

VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW ...................... 98

VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT ........ 99

VIOLATIONS OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES
ACT .................................................................................................. 101

VIOLATIONS OF THE FLORIDA FALSE ADVERTISING STATUTE ................... 102

VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE
PRACTICES ACT ............................................................................... 104

VIOLATIONS OF THE MASSACHUSETTS REGULATION OF BUSINESS
PRACTICES FOR CONSUMERS .................................................... 105

VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT ................. 107

VIOLATIONS OF THE NEW YORK DECEPTIVE ACTS OR PRACTICES AND
FALSE ADVERTISING .................................................................. 108

VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT ................. 110

VIOLATIONS OF THE RHODE ISLAND UNFAIR TRADE PRACTICE AND
CONSUMER PROTECTION ACT .................................................. 111

VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICE AND CONSUMER
PROTECTION ACT ........................................................................ 113

VIOLATIONS OF THE WISCONSIN DECEPTIVE TRADE PRACTICE ACT ........ 114

VIII.    RELIEF NOT REQUESTED AND RESERVATION OF RIGHTS ............................ 116

IX.    PRAYER FOR RELIEF ....................................................................... 116

X.    JURY DEMAND .................................................................................. 117

Plaintiffs MSP Recovery Claims Series, LLC ("MSPRC"); MSPA Claims 1, LLC ("MSPA"); MAO-MSO Recovery II, LLC, Series PMPI ("MAO-MSO"); Series 44, MSP Recovery Claims PROV, Series LLC ("Claims PROV"); and  MSP Recovery Claims CAID, Series LLC ("Claims CAID") (collectively referred to as "MSP") on behalf of themselves and similarly situated third party payors ("TPPs"), submit the following Complaint and Demand for Jury Trial against Defendants Koninklijke Philips NV ("Royal"), Philips North America LLC ("Philips NA"), Philips Holding USA, Inc. ("PHUSA"), Philips RS North America LLC ("Philips RS"), Phillips RS North America Holding Corporation ("Philips RS Holding") (collectively referred to as "Philips"), and Polymer Technologies, Inc. ("PolyTech").

## I.    <u>NATURE OF THE ACTION</u>

1.      Philips manufactures and sells certain lines of products that are intended to help people breathe. These include Continuous Positive Airway Pressure ("CPAP") and Bilevel Positive Airway Pressure ("BiPAP") machines, which are commonly used to treat sleep apnea, and mechanical ventilators ("ventilators"), which treat respiratory failure. In general, these devices blow air into patients' airways. CPAP and BiPAP machines are intended for daily use, and ventilators are used continuously when needed.

2.      On June 14, 2021, Philips announced a recall of millions of its CPAP and BiPAP machines and ventilators (the "Recall"). Each of these recalled products (referred to as a "Recalled Device" or collectively as the "Recalled Devices") contained polyester-based polyurethane ("PE-PUR") foam that Philips used for sound abatement. The PE-PUR foam was provided by, among others, PolyTech. Despite knowing, at least as early as 2015, that PE-PUR foam would degrade and should not be used in the Recalled Devices, Philips waited until June 2021 to issue the Recall and notify the public. In its Recall, Philips publicly announced that the PE-PUR foam may break

down into particles and be inhaled or ingested or may emit volatile organic compounds ("VOCs") that may be inhaled, causing "serious injury, which can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment"[1] (referred to here as the "Defect"). Philips stated that the potential risks of exposure due to such chemicals include "headache/dizziness, irritation (eyes, nose respiratory tract, skin), hypersensitivity, nausea, vomiting, toxic and carcinogenic effects."[2] Philips' announcement to doctors advised that these hazards could cause "serious injury which can be life-threatening or cause permanent impairment."[3]

3.     On July 22, 2021, the U.S. Food and Drug Administration ("FDA") confirmed the severity of the problem and classified the Recall as Class I or "the most serious type of recall," meaning that use of the Recalled Devices "may cause serious injuries or death."[4]

4.     Philips knew about the serious risks caused by the Recalled Devices long before the Recall. According to the FDA, beginning in 2015, Philips received data from a variety of sources regarding degradation of the PE-PUR foam used in the Recalled Devices, including complaints, test reports, information from suppliers, and information from another entity owned by the ultimate parent company of Philips.

---

[1] Philips' Recall Notices dated 6/14/2021 (attached hereto as Exhibit "A"). All attached Exhibits and reference material are incorporated as if fully stated herein.

[2] *Id.*

[3] *Id.*

[4] https://www.fda.gov/medical-devices/medical-device-recalls/philips-respironics-recalls-certain-continuous-and-non-continuous-ventilators-including-cpap-and (last accessed June 16, 2022).

5.    Philips notified its shareholders about the Defect in the Recalled Devices in late April 2021,[5] but did not commence the Recall of its dangerously defective machines until June 14, 2021.

6.    In fact, Philips apparently timed its Recall to coincide with its launch of a next generation of the Recalled Devices, which Philips claims does not suffer from the same defective and harmful foam issues. Thus, at the time of the Recall, the only purportedly safe option that Philips offered to its customers—many of whom require a BiPAP or CPAP machine to sleep safely —was to purchase, *at full price*, Philips' new, next-generation device, profiting Philips further.

7.    Because of the increased demand for safe and effective CPAP, BiPAP, and ventilator devices, replacement machines are expensive and difficult to find, a situation that was exacerbated by a shortage of microchips for these devices. Thus, many users were forced into a Hobson's choice—continue using Philips' Recalled Devices and expose themselves to risks of serious injury or death or stop using them and risk serious health consequences from their underlying conditions.

8.    Philips' flagship line and top selling CPAP Recalled Devices are its DreamStation devices. On September 1, 2021, Philips received authorization from the FDA to begin a repair and/or replacement process for affected DreamStation devices in the United States.[6] DreamStation customers, however, were not told when they might receive a replacement device, nor were they given any specifics as to how the replacement program would work. Moreover, the repair and/or

---

[5] https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2021/philips-first-quarter-results-2021.html (last accessed June 17, 2022).

[6] https://www.usa.philips.com/healthcare/resource-catalog/landing/experience-catalog/sleep/communications/src-update/news/philips-starts-repair-and-replacement-program-of-first-generation-dreamstation-devices-in-the-us-and-other-markets (last accessed June 16, 2022).

replacement process was only for DreamStation Recalled Devices and not for any other Recalled Devices.

9.      The Recalled Devices are:

- E30

- DreamStation ASV

- DreamStation ST, AVAPS

- SystemOne ASV4

- C Series ASV, S/T, AVAPs

- OmniLab Advanced Plus

- SystemOne (Q Series)

- DreamStation CPAP, Auto CPAP, BiPAP

- DreamStation Go CPAP, APAP

- Dorma 400, 500 CPAP

- REMStar SE Auto CPAP

- Trilogy 100 and 200

- Garbin Plus, Aeris, LifeVent

- A-Series BiPAP Hybrid A30

- A-Series BiPAP V30 Auto

- A-Series BiPAP A40

- A-Series BiPAP A30

10.     All of the Recalled Devices share the same defect, the use of PE-PUR foam.

11.     Each of the Plaintiffs paid for or reimbursed payment of a Recalled Device. None of them would have paid for or reimbursed payment of a Recalled Device if they had known it

4

contained PE-PUR foam that could expose their beneficiaries to life-threatening injuries or cause serious health problems, which rendered the Recalled Device defective, unsafe, unmerchantable, and unfit for their intended purpose.

12.     Plaintiffs, individually and on behalf of all others similarly situated who paid for or reimbursed payment of the Recalled Devices, seek to recover economic losses and punitive damages from Philips and PolyTech for breach of express warranty, breach of the implied warranty of merchantability, breach of the implied warranty of usability, violations of the Magnuson Moss Warranty Act and the Racketeer Influenced and Corrupt Organizations ("RICO") Act, as well as fraud, unjust enrichment, redhibition or rescission, and violations of applicable state consumer protection statutes.

## II.    THE PARTIES

### A.    PLAINTIFFS

13.     Plaintiffs are companies that have obtained irrevocable assignments of any and all rights to recover reimbursement or payment from Defendants. Plaintiffs' Assignors (the "Assignors") provide health insurance coverage, pursuant to Medicare Part C and Part D, Medicaid, and commercial contracts for insurance, to persons that subscribe to their plans (the "Enrollees").

*MSPRC*

14.     MSPRC is a Delaware series limited liability company with its principal place of business in Coral Gables, Florida. MSPRC's limited liability company agreement provides for the establishment of one or more designated Series.

15.     MSPRC has established various designated series pursuant to Delaware law to maintain various claims recovery assignments separate from other Company assets, and to account for and associate certain assets with certain particular series. Pursuant to MSPRC's limited liability

agreement, all designated series form a part of MSPRC. MSPRC may receive assignments in the name of MSPRC and further associate such assignments with a particular series or may have claims assigned directly to a particular series. In either event, MSPRC will maintain the right to sue on behalf of each series and pursue any and all rights, benefits, and causes of action arising from assignments to a series. Any claim or suit may be brought by MSPRC in its own name or it may elect to bring suit in the name of its designated series.

16.     MSPRC's limited liability agreement provides that any rights and benefits arising from assignments to any of its series shall belong to MSPRC.

### *MSPA*

17.     MSPA is a limited liability company that is duly organized, validly existing, and in good standing under the laws of Florida, with its principal place of business in Coral Gables, Florida.

### *MAO-MSO*

18.     MAO-MSO, a segregated series of MAO-MSO Recovery II, LLC, is a Delaware series limited liability company that is duly organized, validly existing, and in good standing under the laws of Delaware, with its principal place of business in Cresskill, New Jersey.

### *Series 44*

19.     Series 44 is a duly organized and existing Delaware series limited liability company with its principal place of business in Coral Gables, Florida. Series 44's limited liability company operating agreement provides for the establishment of one or more designated series as permitted by Delaware law. Del. Code Ann. Tit. 6, § 18-215(a). Accordingly, Series 44 established various designated series to serve as units of the company for the purpose of maintaining various claims

recovery assignments separate from other company assets, and to account for and associate certain assets with certain particular series.

20.     Series 44 has enumerated rights relating to its designated series pursuant to its limited liability agreement and consistent with Delaware law. Del. Code Ann. Tit. 6, §§ 18-215(a)-(c). Specifically, all rights and benefits arising from assignments to its series shall belong to Series 44. Series 44 may receive assignments in the name of Series 44 and further associate such assignments with a particular series or may have claims assigned directly to a particular series. In either event, Series 44 and the designated series are authorized to pursue or assert any claim or suit capable of being asserted by any designated series arising from, or by virtue of, an assignment to a designated series. Series 44 retains the legal right to sue on behalf of each designated series and pursue all rights, benefits, and causes of action arising from assignments to a series in its own name or in the name of the designated series.

### Claims PROV

21.     Claims PROV is a duly organized and existing Delaware series limited liability company with its principal place of business in Coral Gables, Florida. Claims PROV's limited liability company operating agreement provides for the establishment of one or more designated series as permitted by Delaware law. Del. Code Ann. Tit. 6, § 18-215(a). Accordingly, Claims PROV established various designated series to serve as units of the company for the purpose of maintaining various claims recovery assignments separate from other company assets, and in order to account for and associate certain assets with certain particular series.

22.     Claims PROV has enumerated rights relating to its designated series pursuant to its limited liability agreement and consistent with Delaware law. Del. Code Ann. Tit. 6, §§ 18-215(a)-(c). Specifically, all rights and benefits arising from assignments to its series shall belong to Claims

PROV. Claims PROV may receive assignments in the name of Claims PROV and further associate such assignments with a particular series or may have claims assigned directly to a particular series. In either event, Claims PROV and the designated series are authorized to pursue or assert any claim or suit capable of being asserted by any designated series arising from, or by virtue of, an assignment to a designated series. Claims PROV retains the legal right to sue on behalf of each designated series and pursue all rights, benefits, and causes of action arising from assignments to a series in its own name or in the name of the designated series.

*Claims CAID*

23.    Claims CAID is a duly organized and existing Delaware series limited liability company with its principal place of business in Coral Gables, Florida. Claims CAID's limited liability company operating agreement provides for the establishment of one or more designated series as permitted by Delaware law. Del. Code Ann. Tit. 6, § 18-215(a). Accordingly, Claims CAID established various designated series to serve as units of the company for the purpose of maintaining various claims recovery assignments separate from other company assets, and in order to account for and associate certain assets with certain particular series.

24.    Claims CAID has enumerated rights relating to its designated series pursuant to its limited liability agreement and consistent with Delaware law. Del. Code Ann. Tit. 6, §§ 18-215(a)-(c). Specifically, all rights and benefits arising from assignments to its series shall belong to Claims Prov. Claims CAID may receive assignments in the name of Claims CAID and further associate such assignments with a particular series or may have claims assigned directly to a particular series. In either event, Claims CAID and the designated series are authorized to pursue or assert any claim or suit capable of being asserted by any designated series arising from, or by virtue of, an assignment to a designated series. Claims CAID retains the legal right to sue on behalf of each

designated series and pursue all rights, benefits, and causes of action arising from assignments to a series in its own name or in the name of the designated series.

25.     Philips is one of the largest manufacturers of CPAP and BiPAP machines in the U.S., accounting for approximately 30% of all CPAP machines sold. Plaintiffs' assignors[7] made payments for or are otherwise financially responsible for CPAP or BiPAP machines and on information and belief paid for defective Recalled Devices. The Assignors or the downstream entities that provided the health services are located in the following states: California, Connecticut, Florida, Illinois, Massachusetts, Michigan, New York, Ohio, Puerto Rico, Rhode Island, Texas, and Wisconsin.

26.     As an example, and to further demonstrate standing, on June 26, 2019, one of the Assignors, AvMed, Inc. ("AvMed"), entered into a Claims Purchase Agreement & Assignment with Series 17-03-615, a designated series of MSPRC, whereby it irrevocably assigned all rights to recover payments made on behalf of its Enrollees (the "AvMed Assignment"). The AvMed Assignment expressly provides, in pertinent part:

> Assignor irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its designated series, successors and assigns, any and all of Assignor's right, title, ownership and interest in and to (i) all Claims existing on the date hereof, whether based in contract, tort or statutory right, and all related recovery rights arising from and related to the claims data transferred to MSP Recovery (or its affiliates or service providers, including [MSP Recovery]), and (ii) any and all causes of action, claims and demands of any nature whatsoever relating to payments for health care services provided to Assignor's members and enrollees, and legal or equitable rights (including, but not limited to, subrogation) to pursue and/or recover monies related to the Claims that Assignor had, may have had, or has asserted against any party in connection with the Claims; and (iii) all causes of action, claims, rights and demands of any nature whatsoever, legal or equitable, against primary payers, Responsible Parties and/or third parties that may be liable to Assignor arising from or relating

---

[7] Although Plaintiffs are not TTPs, Plaintiffs are assignees of TPPs and thereby stand in their assignors' shoes and have standing to represent a class of TPPs.

to the Claims, including claims under consumer protection statutes and laws (all of the items set forth in (i)-(iii), the "Assigned Claims") . . . . The assignment of the Assigned Claims set forth herein is irrevocable and absolute.

27.    Below is a sample of AvMed's payments for Defendants' defective Recalled Devices:

| Patient | Defendant | Product Code | Assignor |
|---------|-----------|--------------|----------|
| D.W. | Philips | dsx500h11 | AvMed |
| G.M. | Philips | dsx500h11 | AvMed |
| P.F. | Philips | Dsx200h11 | AvMed |
| C.T. | Philips | Dsx200h11 | AvMed |
| R.M. | Philips | dsx200h11 | AvMed |
| Z.M. | Philips | ds220hs | AvMed |
| E.T. | Philips | dsx200h11 | AvMed |

## B.    DEFENDANTS

28.    Royal is a Dutch multinational company having its principal executive offices at Philips Center, Amstelplein 2, 1096 BC Amsterdam, The Netherlands. Royal Philips is the parent company of the Philips group of healthcare technology businesses, including Connected Care businesses focusing on Sleep & Respiratory Care. Royal Philips, directly or indirectly, wholly owns its subsidiaries Philips North America LLC and Philips RS North America LLC.[8] As such,

---

[8] Philips 2020 annual filing with the SEC, fn. 8, https://www.sec.gov/Archives/edgar/data/313216/000031321621000008/phg-exhibit8.htm (last accessed June 16, 2022).

Royal Philips controls Philips North America LLC and Philips RS North America LLC with respect to the manufacturing, selling, distributing, and supplying of the Recalled Devices.[9]

29.    Philips NA is a Delaware company with its principal place of business at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. Philips NA is a wholly owned subsidiary of Royal Philips. Philips NA manages the operation of Royal Philips' various lines of business, including Philips RS North America LLC, in North America. The sole member of Philips NA is Philips Holding USA, Inc. Philips NA is wholly owned by Philips RS North America Holding Corporation which, in turn, is wholly owned by Philips Holding USA, Inc.

30.    PHUSA is a Delaware corporation with its principal place of business at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. PHUSA is a holding company that is wholly owned, directly or indirectly, by Royal Philips. PHUSA owns 100% of Philips RS North America LLC and Philips RS North America Holding Corporation, and is the member/manager of Philips NA.

31.    Philips RS is a Delaware company with its principal place of business at 6501 Living Place, Pittsburgh, Pennsylvania 15206. Philips RS was formerly operated under the business name Respironics, Inc. ("Respironics"). Royal Philips acquired Respironics in 2008.[10] Philips RS is wholly owned by Philips RS North America Holding Corporation, which in turn, is wholly owned by PHUSA.

---

[9] Philips 2020 annual filing with the SEC, https://www.sec.gov/ix?doc=/Archives/edgar/data/0000313216/000031321621000008/phg-20201231.htm (last accessed June 16, 2022).

[10] Philips announces completion of tender offer to acquire Respironics, WEB WIRE, https://www.webwire.com/ViewPressRel.asp?aId=61199 (last accessed June 16, 2022).

32.     Philips RS Holding is a Delaware corporation with its principal place of business at 222 Jacobs Street, Cambridge, Massachusetts 02141, and is wholly owned by PHUSA. Accordingly, Philips RS Holding is a citizen of Massachusetts and Delaware.

33.     At all relevant times, each of the Philips Defendants acted in all respects as each other's agent and alter ego, and reference to "Philips" refers to each Philips Defendant individually and collectively.

34.     Defendant PolyTech is a Delaware Corporation with its principal place of business at 420 Corporate Boulevard, Newark, Delaware 19702. PolyTech directly or through another intermediary provided Philips with the PE-PUR foam that was used in the Recalled Devices.

### III.     <u>JURISDICTION AND VENUE</u>

35.     The Court has subject matter jurisdiction over the federal claims asserted herein under 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367. The Court has jurisdiction under 28 U.S.C. § 1331 for the RICO and Magnuson-Moss Warranty claims, and under 28 U.S.C. § 2310(d) for the Magnuson-Moss Warranty claims. The Court also has jurisdiction under 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the amount in controversy exceeds $5 million, exclusive of interest and costs, and this is a class action in which Plaintiffs and some Class members are citizens of different states than Defendants. *See* 28 U.S.C. § 1332(d)(2)(A).

36.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in this District.

# IV.    FACTUAL ALLEGATIONS

## A.    CPAP AND BIPAP MACHINES AND VENTILATORS ARE PRESCRIBED TO TREAT BREATHING DISORDERS

37.    Sleep apnea is a sleeping disorder in which breathing is disturbed during sleep. These disturbances are called "apneas."

38.    According to the Mayo Clinic, the main types of sleep apnea are obstructive sleep apnea, central sleep apnea, and complex sleep apnea syndrome (also known as treatment-emergent central sleep apnea).

39.    Obstructive sleep apnea is the most common type. It occurs when the muscles in the back of the throat relax during inhalation, which causes the airway to narrow or close and prevent sufficient air from passing through. This in turn lowers the oxygen level in the blood, which causes the brain briefly to wake the body from sleep to reopen the airway. This reawakening may be so brief that the patient does not remember it, and it may be associated with snorting, choking, or gasping. It can happen anywhere from a few times per hour to once every few minutes, and can prevent the patient from reaching the deep, restful phases of sleep.

40.    Central sleep apnea occurs when the brain fails to transmit signals to the breathing muscles. As a result, the body stops breathing, which can cause waking with shortness of breath or difficulty getting to sleep or staying asleep.

41.    Complex sleep apnea syndrome occurs when a patient has both obstructive sleep apnea and central sleep apnea. An image showing how an airway can be blocked as a result of sleep apnea appears below:



42.    CPAP therapy is a common treatment for sleep apnea. In CPAP therapy, a machine delivers a flow of air through a mask over the nose or mouth, which increases air pressure in the throat so that the airway does not collapse during inhalation. CPAP therapy assists breathing during sleep and can successfully treat sleep apnea. The illustration below shows a generic CPAP machine being used by a patient while sleeping.



43.    Another therapy to treat sleep apnea includes use of BiPAP machines, which use two different pressures – one for inhaling and one for exhaling.

44.    Patients customarily place the CPAP or BiPAP machines on a nearby nightstand or shelf. A hose connects the unit to the mask, which is worn over the nose or mouth during sleep. Below is an image of a Philips DreamStation machine on a nightstand.

14



45.    Patients who use CPAP or BiPAP machines typically must use them every time they sleep.

46.    Mechanical ventilators, usually called "ventilators," often are used to treat respiratory failure. Ventilators push air into and out of the patient's lungs like a bellows, typically through a tube that is connected to the machine on one end and inserted through the patient's nose or mouth into the trachea on the other end. Patients are typically sedated while on ventilation because otherwise it can cause intense pain. Ventilators also can be used in other circumstances, such as during surgery when general anesthesia may interrupt normal breathing. There are also ventilators for home use. The following image from the National Institutes of Health shows a typical ventilator and how it works:



### B.    PHILIPS SOLD CPAP, BIPAP, AND VENTILATOR DEVICES CONTAINING PE-PUR FOAM

47.    Philips manufactures and sells CPAP and BiPAP machines and ventilators. According to Philips' 2020 Annual Report,[11] Sleep & Respiratory Care constituted 49% of Philips' total sales in its Connected Care line of business, which in turn accounted for 28% of Philips' overall sales of about €19.535 billion (*i.e.*, $22,541,631,850). Philips has sold millions of CPAP and BiPAP machines and ventilators in the United States.

---

[11] https://www.results.philips.com/publications/ar20/downloads/pdf/en/PhilipsFullAnnualReport2020-English.pdf?v=20210531142942 (last accessed June 16, 2022).

48.     The basic technology used in CPAP and BiPAP devices was developed in 1980 by an Australian pulmonologist, Dr. Colin Sullivan, who used it to treat dogs with respiratory problems, before the technology was adapted for human use.

49.     Respironics commercialized this technology and sold the first publicly available CPAP device in 1985. ResMed, an industry competitor, followed with the release of its CPAP device in 1989.

50.     These first-generation CPAP and BiPAP devices created a new and commercially viable field of respiratory therapy. The devices, however, were large and noisy, resulting in an "arms-race" between manufacturers to develop devices that were smaller, more responsive to patient breathing patterns, and quieter.

51.     The noise level of CPAP and BiPAP devices became a driver of adult consumer preference, because loud devices interrupt the peaceful sleep of both patients and their partners, making it less likely that a patient will continue to use the device.

52.     Noise is also a problem in neonatal intensive care units where infants, especially those born prematurely, may remain on ventilators or CPAP or BiPAP devices for long periods.

53.     To develop the quietest devices on the market with the lowest decibel ratings, device manufacturers such as Philips filled CPAP, BiPAP, and ventilator devices with sound-abating foam to reduce the level of noise emitted from the motor and airflow.

54.     Since at least 2009, Philips has incorporated PE-PUR foam in its CPAP, BiPAP, and ventilator devices for sound-abatement purposes.

55.     In fact, the relative quiet of DreamStation products factored prominently in Philips'

marketing.[12] Philips put out information that it had extensively studied and measured the amount

of noise produced by DreamStation products. Philips even included an infographic claiming that

DreamStation products are barely louder than a whisper.

56.     Polyurethane is an organic polymer in which urethane groups connect the molecular

units and is usually formed by reacting a diisocyanate or triisocyanate with a polyol. Under certain

circumstances, polyurethane may break down into diisocyanate or triisocyanate.

57.     The two main types of polyurethane are polyester and polyether. Polyester

polyurethane has much better shock absorption and vibration-dampening properties and is

commonly used for soundproofing or sound dampening.

58.     It has been known for decades that polyester polyurethane is subject to breakdown

*via* hydrolysis, particularly in medical applications. For example, a chapter of a scientific

encyclopedia published in 2013 states: "Poly(ester urethanes) were the first generation of PURs

used in medical devices but were found unsuitable for long-term implants because of rapid

hydrolysis of the polyester soft segment[.]"[13]

59.     Polyether polyurethane, on the other hand, is less prone to breakdown *via*

hydrolysis. The same encyclopedia chapter notes that polyether polyurethanes "with excellent

---

[12] *See*
https://www.documents.philips.com/assets/20170523/62e4f43a1349489ba3cca77c0169c6ef.pdf
(last accessed June 16, 2022).

[13] Pal Singh Chauhan, N., and Kumari Jangid, N., "Polyurethanes and Silicone Polyurethane
Copolymers," Chapter in Encyclopedia of Biomedical Polymers and Polymeric Biomaterials,
January 2013, *available at*
https://www.researchgate.net/publication/236144965_POLYURETHANES_AND_SILICONE_
POLYURETHANE_COPOLYMERS (last accessed June 16, 2022).

hydrolytic stability replaced poly(ester urethanes) and have been used in medical devices for the past two decades."[14]

60.    All the Recalled Devices contain polyester polyurethane (PE-PUR) foam.

61.    In the DreamStation Recalled Device, for example, there is a channel that surrounds the central fan in the device. The top of this channel is stuffed with PE-PUR foam to absorb the noise from the machine while the patient is sleeping. Air passes through this channel underneath the PE-PUR foam before it enters the fan and is pumped into the patient's airway.

62.    There were readily available alternatives available to Philips other than to use PE-PUR foam for sound abatement, including, without limitation, other types of sound-abating foam.

63.    One of Philips' primary competitors, ResMed, primarily uses polyether polyurethane foam, not PE-PUR foam, for sound dampening.[15]

### C.    PHILIPS KNEW OF THE DANGERS OF PE-PUR FOAM SINCE AT LEAST 2015

64.    The FDA has concluded that:

> Beginning in 2015, Philips received data from a variety of sources regarding degradation of the PE-PUR foam contained within the recalled devices, including complaints, test reports, information from suppliers, and information from another entity owned by Philips' parent company. Philips failed to adequately evaluate this data and incorporate it into its CAPA [Corrective and Preventive Actions] system for further investigation and potential mitigation, as required by current good manufacturing practice requirements codified in 21 C.F.R. § 820.100.[16]

65.    The FDA's finding was based in part on twenty-one (21) site inspections of Philips' Murrysville, Pennsylvania facility between August 26, 2021 and November 9, 2021. The lead FDA

---

[14] *Id.*

[15] https://www.resmed.com/en-us/other-manufacturer-recall-2021/ (last accessed June 16, 2022).

[16] https://www.fda.gov/media/158129/download (last accessed June 16, 2022) ("518(b) Notice"), at 6.

investigator, Katelyn A. Staub-Zamperini, memorialized the agency's finding in a 28-page FDA-483 Report issued on November 9, 2021.[17] The FDA delivered this 483 Report to Rodney Mell, Head of Quality at Philips Respironics, on or around November 9, 2021.[18]

66.    A 483 Report "is issued to firm management at the conclusion of an inspection when an investigator(s) has observed any conditions that in their judgment may constitute violations of the Food Drug and Cosmetic (FD&C) Act and related Acts."[19] These observations are made in a 483 Report "when in the investigator's judgment, conditions or practices observed would indicate that any food, drug, device or cosmetic has been . . . or is being prepared, packed, or held under conditions whereby it may become adulterated or rendered injurious to health."[20]

67.    In connection with the FDA's investigation that resulted in its 483 Report, the FDA learned that Philips had received numerous complaints from customers in the field about degradation of the foam in its Recalled Devices starting as far back as 2008:

> [A] query of your firm's consumer complaints from 01/01/2008 to current, for the keywords contaminants, particles, foam, debris, airway, particulate, airpath, and black, **resulted in over 222,000 complaints, and over 20,000 of which occurred between 2008 to 2017 and involved Trilogy devices**. Additionally, your firm performed a foam related complaint data analysis in April 2021 on complaints confirmed to be related to or involve foam degradation issues. The raw complaint data documents that **30 Trilogy related complaints were received from 2014 to 2017, and 1,254 related complaints were received across all products containing the affected foam, from 2014 to 2021**.[21]

---

[17] A redacted version of the 483 report is available here: https://www.fda.gov/media/154244/download (last accessed June 16, 2022). ("483 Report").

[18] *Id.* at 1, 28.

[19] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions (last accessed June 16, 2022).

[20] *Id.*

[21] 483 Report at 12 (emphasis added).

68.    Yet, "[n]o formal investigation, risk analysis, or CAPA were initiated, performed, or documented [by or on behalf of Philips], in response to the at least 222,000 complaints that could potentially be related to foam degradation and received from 2008 to 2017 . . . ."[22]

69.    A Corrective and Preventative Action ("CAPA") refers to procedures that medical device manufactures must follow to identify and attempt to correct when a quality problem is detected. *See* 21 C.F.R. § 820.100. A CAPA is designed "to collect information, analyze information, identify and investigate product and quality problems, and take appropriate and effective corrective and/or preventive action to prevent their recurrence."[23]

70.    The FDA also found that Philips "was made aware of polyester polyurethane foam degradation issues in/around October 2015 . . . ."[24]

71.    In fact, an adverse event report from the FDA Manufacturer and User Facility Device Experience ("MAUDE") database shows that, as early as 2011, Philips knew that a patient had discovered "black dust" on her nose when she awoke after using a Philips RemStar CPAP device and subsequently underwent treatment for "intoxication" and "chest tightness."[25]

72.    Philips investigated this report and confirmed that the device contained "evidence of an unk[nown] black substance in the air path and on internal components . . . present throughout both the intake and exhaust portions of the air path . . . ."[26]

---

[22] *Id.* at 16.

[23] https://www.fda.gov/corrective-and-preventive-actions-capa (last accessed June 16, 2022).

[24] 483 Report at 18.

[25] MAUDE Adverse Event Report: RESPIRONICS, INC. REMSTAR PRO INTERNATIONAL, http://www.fdable.com/advanced_maude_query/324fd08a137ce36c2d5faf453ee26f2f (last visited June 16, 2022).

[26] *Id.*

73.    Philips, however, stubbornly denied that the presence of the black substance was due to a product defect.

74.    The FDA found that Philips' analysis of consumer complaints was itself defective in that it "was not adequately performed to identify or detect quality problems."[27] The FDA concluded that "potential foam degradation in Trilogy ventilator devices is not an isolated incident, and you [Philips] also have not documented a detailed rationale for why harm is not likely to occur again, as required by your Health Hazard Evaluation's instructions."[28] In light of this finding, the FDA concluded that Philips' "risk analysis is inadequate or was not performed when appropriate or within an appropriate time frame of your firm becoming aware" of these issues.[29]

75.    On May 2, 2022, the FDA issued a formal notice to Philips pursuant to Section 518(b) of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 360h(b) (the "518(b) Notice").[30] The 518(b) Notice stated that the FDA's "Center for Devices and Radiological Health (CDRH) is proposing that an order should be issued pursuant to section 518(b)" of the FDCA "to require Philips to submit a plan for the repair, replacement, and/or refund of the purchase price of devices subject to the recall that were manufactured after November 2015, sufficient to assure that the unreasonable risk of substantial harm to the public health presented by those devices will be eliminated."[31] This notice was directed to Thomas J. Fallon, Head of Quality, Sleep and Respiratory Care, for Philips Respironics, Inc.

---

[27] 483 Report at 16.

[28] *Id.* at 13.

[29] *Id.* at 3.

[30] https://www.fda.gov/media/158129/download (last accessed June 16, 2022).

[31] 518(b) Notice at 1.

76.     The 518(b) Notice stated that "there is sufficient evidence for FDA to determine that the devices subject to the recall present an unreasonable risk of substantial harm to the public health" and "that there are reasonable grounds to believe that the recalled devices that Philips manufactured after November 2015 were not properly manufactured with reference to the state of the art as it existed at the time of the devices' manufacture."[32]

77.     The 518(b) Notice also stated that "there is sufficient evidence for FDA to determine that there are reasonable grounds to believe that the risk associated with the devices was not caused by the failure of a person other than Philips to exercise due care in the installation, maintenance, repair, or use of the devices at issue." The 518 Notice specifically found that "evidence indicates that the unreasonable risk associated with the products was not caused by the use of ozone cleaning agents, nor did the use of ozone to clean the products constitute a failure to exercise due care."[33]

78.     The FDA's 518 Notice concluded that "patients and providers cannot readily mitigate the unreasonable risk associated with the recalled devices[.]"[34]

79.     The FDA also concluded that "[t]his risk is not the unavoidable byproduct of current ventilator, CPAP machine, and BiPAP machine technologies. Indeed, Philips and its competitors market ventilators, CPAP machines, and BiPAP machines that do not use PE-PUR foam."[35]

---

[32] *Id.* at 2.

[33] *Id.*

[34] *Id.*

[35] *Id.* at 6.

### 1.   In 2015, Philips Communicated with Its Foam Suppliers about the Problem of PE-PUR Foam Degradation

80.   The PE-PUR foam that Philips used in its Recalled Devices was manufactured by William T. Burnett & Co. ("Burnett"), a bulk foam manufacturer. Burnett produces foam in sheets that are approximately four feet to more than six feet wide and may be as long as one hundred or two hundred feet.

81.   Burnett sells its bulk foam to intermediaries, including Defendant PolyTech and The SoundCoat Company ("SoundCoat"). PolyTech and SoundCoat then sell the foam to Philips, either directly or through another intermediary, Paramount Die Corporation, which may modify the foam.

82.   According to the FDA, "email correspondence between [Philips] and its raw foam supplier [PolyTech] beginning 10/30/2015 and forward, document that [Philips] was made aware of polyester polyurethane foam degradation issues in/around October 2015, which was later confirmed by [Philips'] foam supplier on 08/05/2016, via email."[36]

83.   On August 5, 2016, Bob Marsh, a PolyTech employee, wrote to Lee Lawler, an employee of Burnett, referencing a concern expressed by one of its customers [Philips] in the Fall of 2015 regarding foam degradation in its medical devices.[37] Mr. Marsh stated: "They [Philips] are asking again, and wondered if we could give them any estimate on lifespan of the foam when exposed to 40 C and high humidity."[38] Mr. Lawler responded that, under those conditions, he "would not be surprised if ester foam . . . would exhibit signs of hydrolysis in as short a time as a

---

[36] 483 Report at 18.

[37] *See* Email exchange between Bob Marsh at PolyTech and Lee Lawler at Burnett (Affidavit of Lee Lawler, Technical and R&D Manager at Burnett ("Lawler Aff.") Exh. E, filed in MDL 3014, Case 2:21-mc-01230-JFC, at Doc. 589-7) (attached hereto as Exhibit "B"), at WTB 000056.

[38] *Id.*

year."[39] He added that "that is not a good environment for polyester foam. Polyether foam could last years in that environment."[40] Mr. Marsh responded that he would "let them [presumably Philips] know they'd be better off with the ether."[41]

84.    Knowing about these issues with the PE-PUR foam, Philips tested the foam material used in its Recalled Devices. According to the FDA, "this testing spoke only to the limited finding that in the case of the [redacted] foam samples 'returned from service in a Pacific rim location,' spectroscopy results were 'consistent with an environmental/chemical exposure causing base polymer cleavage and embrittlement of the material.'"[42] Nonetheless, based on the results of this limited testing, Philips concluded that no escalation to a CAPA process was required.

85.    According to the FDA, "no further investigation, health hazard evaluation, risk analysis, or design review was performed or documented by Philips at that time . . . and no preventative maintenance procedures were implemented[,]" other than a limited "preventative maintenance procedure" instituted by a "Philips … entity owned by the parent company of Philips Respironics" "to replace the air intake assembly of Trilogy ventilator products, due to complaints that had been received regarding degradation of the PE-PUR foam."[43] Further, "Philips did not verify the effectiveness of this measure."[44]

---

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] 518(b) Notice at 7.

[43] *Id.* at 6-7.

[44] *Id.* at 8.

86.     Philips was alerted to more warning signs as it continued to ask its supplier about the properties of the PE-PUR foam it was continuing to put in medical devices that millions of its customers were breathing through daily.

87.     Testing conducted for Philips in 2016 confirmed that Mr. Lawler from Burnett was correct. According to the FDA, this testing "determined that the PE-PUR foam was susceptible to degradation, resulting in the conclusion at that time that 'polyester urethanes show bad resistance against high humidity in combination with high temperature.'"[45] Additional testing "determined that, compared to PE-PUR foam, another type of foam, polyether urethane, 'show[s] a far better resistance against high humidity at high temperature.'"[46]

88.     The 483 Report identified "at least fourteen instances, assessments, and/or test reports, dated from 04/01/2016 to 01/22/2021, where [Philips] was aware of issues and concerns related to potential foam degradation and/or Volatile Organic Compound (VOC) emissions, with various Sleep and Respiratory care devices."[47] It listed the specific analyses and tests, including one which concluded that "contrary to polyester urethane foams, [redacted] foams show a far better resistance against high humidity at high temperature."[48]

89.     Philips received at least 110 complaints confirmed to be related to foam degradation between 2014 and 2017.[49] Approximately 80 of these complaints concerned CPAP and BiPAP devices.[50]

---

[45] *Id.* at 7-8.

[46] *Id.* at 8.

[47] 483 Report at 3.

[48] *Id.* at 4.

[49] 518(b) Notice at 7.

[50] *Id.* at 8.

90.     Nonetheless, Philips continued manufacturing and selling the now Recalled Devices containing PE-PUR foam.

### 2.      Philips Opened an Internal Investigation into Foam Degradation in Mid-2018 that Confirmed PE-PUR Foam Is Prone to Degradation

91.     On April 12, 2018, Philips opened a precursor to a formal CAPA, referred to by Philips as CAPA INV 0988, "to investigate complaints related to potential foam degradation for the Trilogy devices in Australia and to determine what actions should be taken."[51] Philips reported that "[u]nits were returned from the field where the Trilogy Removable Air Path Foam [redacted] and the foam in the Inlet Air Path Assembly [redacted] was degrading, and getting into the motor/air path, causing at least 1 Trilogy unit to fail."[52]

92.     On April 20, 2018, Vincent Testa, a Project Mechanical Engineer at Philips, emailed Bonnie Peterson, Project Manager at PolyTech. Mr. Testa stated:"We use the PAFS foam in the air path of our Trilogy family of ventilators as a means for noise reduction . . . ."[53] PAFS foam is PolyTech's open cell, flexible acoustical grade PE-PUR foam.[54] Mr. Testa at Philips continued: "Recently weve [sic] received a few complaints from our customers that the foam is disintegrating . . . . The material sheds and is pulled into the ventilator air path. As you can imagine,

---

[51] *Id.*

[52] 483 Report at 14.

[53] *See* Email from Vincent Testa at Philips to Bonnie Peterson at PolyTech (Lawler Aff. Exh. H, filed in MDL 3014, Case 2:21-mc-01230-JFC, at Doc. 589-10) (attached hereto as Exhibit "C"), at WTB 000070.

[54] https://www.polytechinc.com/products/acoustic-foam (last accessed June 16, 2022).

this is not a good situation for our users."[55] Mr. Testa asked, "what could cause this material to break down."[56]

93.     On April 23, 2018, Mr. Marsh from PolyTech forwarded Philips' April 20, 2018 email to Mr. Lawler from Burnett, reporting that "[t]he customer [Philips] is finding degradation of the ester foam and the urethane film in their device, such that particles are breaking off and flowing in the airstream."[57]

94.     On May 2, 2018, Mr. Marsh added, in an email to Mr. Lawler, that "Philips gave us another bit of information. They tested ether vs ester in high heat and humidity and found ether to be the better performer. It validated what we (you) had conveyed."[58] Mr. Marsh asked whether exposure to oxygen, higher temperature, and higher humidity could accelerate deterioration of PE-PUR foam.[59]

95.     Mr. Lawler responded that he did "not believe that exposure to oxygen will cause any significant damage to polyurethane foam unless elevated temperature and/or humidity is also present."[60]

96.     Mr. Testa from Philips admitted, in a May 3, 2018 follow-up email to Bob Marsh from PolyTech, that:

---

[55] *See* Email from Vincent Testa at Philips to Bonnie Peterson at PolyTech (Lawler Aff. Exh. H) (Exhibit "C" hereto), at WTB 000070.

[56] *Id.*

[57] *See* Email from Bob Marsh to Lee Lawler dated 4/23/2018 (Lawler Aff. Exh. H) (Exhibit "C" hereto), at WTB 000070.

[58] *See* Email from Bob Marsh to Lee Lawler dated 5/2/2018 (Lawler Aff. Exh. H) (Exhibit "C" hereto), at WTB 000069.

[59] *Id.*

[60] *See* Email from Lee Lawler to Bob Marsh dated 5/2/2018 (Lawler Aff. Exh. H) (Exhibit "C" hereto), at WTB 000069.

We [Philips] are evaluating our options regarding the foam. We could switch to the PAF [ether-based foam], or we could indicate a preventative maintenance cycle in which they would replace the PAFS [ester-based] foam pieces. . . . The environmental conditions for our device are a maximum of 40C and 95% R.H. Note the difference in temperature.[61]

97.    Mr. Testa at Philips then asked Bob Marsh from PolyTech the following:

1. Please ask your foam supplier to calculate the service life based on this higher temperature (40C vs. 27C).

a. It would also be useful if they could provide a graph depicting failure over time. For example, if tensile strength reduced over time, they would plot strength vs. time.

2. At the end of the service life, what is the failure mode of this material?[62]

98.    Mr. Marsh again forwarded these questions to Mr. Lawler at Burnett, who responded:

I am unable to answer Question Number 1. We would not recommend using **polyester** foam in such an environment and have no direct data to use to calculate the rate of hydrolysis. **Polyether** foam lifetime would not be expected to reduce significantly at the stated conditions. Use with pure oxygen could shorten the lifetime some by promoting more rapid oxidation. I do not know the extent of the reduction, but do not expect it to be overly significant.

Polyester foam will lose tensile strength and overall integrity as it hydrolyzes. It will eventually decompose to a sticky powder. That will happen very rapidly at 40C, 95% R.H.[63]

99.    Mr. Lawler from Burnett added: "Is it one of our data sheets that states foam lifetime being 10 years at 95% R.H? I do not think I have seen a sheet with that statement."[64] Mr. Marsh at PolyTech responded that he would pass along the information to Philips and that "[w]e

---

[61] *See* Email from Vincent Testa to Bob Marsh dated 5/3/2018 (Lawler Aff. Exh. H) (Exhibit "C" hereto), at WTB 000068-69).

[62] *Id.*

[63] *See* Email from Lee Lawler to Bob Marsh dated 5/4/2018 (Lawler Aff. Exh. H) (Exhibit "C" hereto), at WTB 000067-68.

[64] *Id.* at WTB 000068.

have no idea where that statement came from. It has been on our data sheets for probably 20 years. We are removing it."[65]

100.    On May 23, 2018, Mr. Marsh from PolyTech forwarded to Lee Lawler another question from Mr. Testa at Philips, about the degradation of the foam it was using in its Recalled Devices.[66] Mr. Testa explained that Philips had "sent samples to a local lab for analysis."[67] The local lab concluded that the degradation was a result of cleavage of the bonds in the base polymer, and Mr. Testa stated that "[f]urther investigation concluded that prolonged exposure to high humidity causes the foam to degrade."[68] Mr. Testa noted that "[a]s the foam degrades it breaks down into small particulate," and asked whether the foam "maintain[s] its UL 94 Flame Resistance rating if it is broken down into particulate?"[69]

101.    Mr. Lawler replied: "I am sure the degraded foam will not perform well in UL94 testing, though I cannot imagine how one would actually perform the test on such degraded material."[70]

102.    On June 7, 2018, Mr. Testa at Philips again emailed Mr. Marsh at PolyTech:

---

[65] *See* Email from Bob Marsh at PolyTech to Lee Lawler at Burnett dated 5/4/2018 (Lawler Aff. Exh. H) (Exhibit "C" hereto), at WTB 000067. Notably, PolyTech still advertises on its website that PE-PUR foam is resistant to heat and humidity. *See* https://www.polytechinc.com/products/polymer-acoustic-foam (last accessed June 16, 2022) ("Ester foams have superior physical properties and offer excellent resistance to heat, moisture, and chemicals.").

[66] *See* Email from Bob Marsh to Lee Lawler dated 5/23/2018 (Lawler Aff. Exh. H) (Exhibit "C" hereto), at WTB 000066-67.

[67] *Id.* at WTB 000066.

[68] *Id.* at WTB 000067.

[69] *Id.*

[70] *See* Email from Lee Lawler to Bob Marsh dated 5/23/2018 (Lawler Aff. Exh. H) (Exhibit "C" hereto), at WTB 000066.

As we continue our investigation of the deterioration of the PAFS foam, a few questions has [*sic*] been posed regarding the material. Can you please reach out to your foam supplier regarding the following.

1. What is the actual composition of the polyurethane-ester foam PAFS-038? (CAS #s/percentages/weight percent/reactive groups etc. any chemistry is very appreciated)

2. What kind of diisocynate is used in the polyurethane foam synethesis process and how much?

3. Is diethylene glycol or another polyol utilized in the foam synthesis process?

4. Have you tested to see if all diisocyanate groups are reacted in your foam or are there unreacted groups even after manufacturing?[71]

103.    Mr. Marsh forwarded the questions to Mr. Lawler at Burnett, who asked why Mr. Testa needed this information. Mr. Marsh did not provide a definitive answer but said, "What Vince [Testa] told us is that they are investigating alternatives to polyurethane foam (ester and ether)."[72] Mr. Lawler ultimately did not answer Mr. Testa's questions because they touched on Burnett's confidential, proprietary information.

104.    On June 20, 2018, Philips closed CAPA INV 0988.[73] According to the FDA, Philips implemented "a preventative maintenance procedure for Trilogy devices, but Philips did not verify the effectiveness of this measure."[74] Yet "after CAPA INV 0988, Philips modified its CAPA procedures to include 'requirements to help ensure that CAPAs are fully complete [and] appropriately scoped,' and that 'processing the issue [that was the subject of CAPA INV 0988]

---

[71] *See* Email from Vincent Testa to Bob Marsh dated 6/7/2018 (Lawler Aff. Exh. I, filed in MDL 3014, Case 2:21-mc-01230-JFC, at Doc. 589-11) (attached as Exhibit "D" hereto), at WTB 000076-77.

[72] *See* Email from Bob Marsh to Lee Lawler dated 6/14/2018 (Lawler Aff. Exh. I) (Exhibit "D" hereto), at WTB 000075.

[73] 483 Report at 15.

[74] 518(b) Notice at 8.

through the current CAPA program would have result[ed] in an appropriate horizontal assessment.'"[75]

105.    The FDA pointed out that Philips' informal CAPA INV[76] regarding its Trilogy devices did "not include, investigate, or examine all of your firm's CPAP and BiPAP medical devices, which also include similar air path assemblies and/or the affected polyester polyurethane foam, which is susceptible to degradation."[77] But Philips had acknowledged to the FDA that it had "received approximately eighty complaints related to foam degradation, **on non-Trilogy ventilator devices**, from 2014 to 2017."[78]

106.    The FDA concluded that Philips had not "adequately established" procedures for initiating CAPA procedures.[79] Specifically, the FDA faulted Philips for not initiating a "formal" CAPA after receiving "various complaints alleging foam degradation in Trilogy ventilator devices" and then closing its informal investigation just two months later without "verify[ing] the effectiveness" of the limited "preventative maintenance procedure for Trilogy devices."[80]

107.    Philips continued to receive more information that suggested that the PE-PUR foam was prone to degradation. According to the FDA, "[a] follow-up email amongst your firm's [Philips'] personnel, dated 08/24/2018, states that testing confirmed that the affected foam breaks

---

[75] *Id.*

[76] The 483 Report explained that Philips' practice at the time was to first open CAPA requests—called "CAPA INVs"—as a precursor to a formal CAPA, but this could only occur if approved by a "CAPA Review Board" or delegate. *See* 483 Report at 14-15.

[77] *Id.* at 15.

[78] *Id.* at 16 (emphasis supplied).

[79] *Id.* at 14.

[80] 518(b) Notice at 8.

down in high heat and high humidity environments, which concurred with Trilogy ventilator related complaints . . . ."[81]

108.    Further, "[o]n December 12, 2018, several months after CAPA INV 0988 was closed, a report from additional testing conducted for Philips found that '[p]olyester polyurethane foam showed clear disintegration after 2 weeks."[82]

109.    Nonetheless, Philips continued manufacturing and selling the Recalled Devices containing PE-PUR foam.

### 3.    Philips Finally Opened a Formal CAPA in 2019 – But Did Not Initiate a Recall for Two More Years

110.    In April 2019, Philips received two complaints that "sound abatement foam 'is degrading and entering the air path[.]'"[83]

111.    In response, in June 2019, Philips finally initiated a formal CAPA, numbered CAPA 7211, regarding the issues associated with the PE-PUR foam. But, as the FDA explains:

> Even then, that CAPA failed to evaluate all relevant data. Philips' search of FDA's Manufacturer and User Facility Device Experience (MAUDE) database in connection with CAPA 7211 identified only three medical device reports (MDRs) associated with potential foam degradation involving Trilogy ventilators between January 2011 and January 2021. Yet an MDR analysis conducted by Philips in 2018 had already identified 17 documented complaints related to foam degradation in Trilogy ventilators, and at least 14 of those 17 complaints had related MDRs. Similarly, Philips' analysis of foam degradation-related complaints conducted in connection with CAPA 7211 identified 1,254 complaints confirmed to be related to foam degradation between 2014 and April 2021 across all affected products, yet this analysis failed to include several complaints confirmed to be related to foam degradation in Trilogy ventilators that were documented in 2018 in connection with CAPA INV 0988.[84]

---

[81] 483 Report at 18.

[82] 518(b) Notice at 8.

[83] *Id.*

[84] *Id.* at 8-9.

112.    Philips continued to test the PE-PUR foam while the CAPA was underway. A Biological Risk Assessment dated July 2, 2020, found that "the biological and toxicological risks from exposure to degraded PE-PUR foam are of concern…."[85]

113.    Another internal "Biological Risk Assessment" dated December 10, 2020 – and "conducted as a result of field reports/complaints regarding degraded sound abatement foam in various CPAP and ventilator products"[86] – described the risks that degraded polyurethane foam posed to humans in no uncertain terms:

> The cytotoxicity and positive genotoxicity results observed from degraded PE-PUR foam samples **indicate a potential patient risk. Potential cytotoxicity and genotoxicity leading to carcinogenicity are possible outcomes from degraded PE-PUR foam exposure.** Overall, based on an understanding of the toxicological significance of the foam degradants and the results of the ISO 10993 testing to include mutagenic responses in both a bacterial and mammalian system, **the degraded PE-PUR foam is not considered biocompatible and presents a significant biological risk to those patient populations who are exposed to degraded PE-PUR foam.**[87]

114.    An additional Philips' Biocompatibility Risk Assessment dated January 11, 2021, concurred that degraded PE-PUR foam "presents a significant biological risk to patients," and goes on to state that "[p]otential cytotoxicity and genotoxicity leading to carcinogenicity are possible outcomes from degraded PE-PUR foam exposure."[88]

115.    Ultimately, in CAPA 7211, Philips concluded that "the cause of the foam degradation condition is long-term exposure to environmental conditions of high temperature combined with high humidity," and restated that "the cause of degradation was due to chemical

---

[85] 483 Report at 7; *see also id.* ("Philips Respironics Inc. (PRI) was made aware in May 2019 that four CPAP units were returned to a service center with degraded sound abatement foam.").

[86] *Id.* at 8.

[87] *Id.* at 7-8 (emphasis added).

[88] *Id.* at 8.

breakdown of the foam due to exposure to water caused by long-term exposure to environmental conditions."[89]

116.    Based on its investigation, the FDA concluded that Philips' upper management was aware of the foam degradation issues, discussed it at numerous management-review meetings, but still delayed doing anything about it:

> [F]irm management, including management with executive responsibility, were aware of potential foam degradation issues concerning CPAPs, BiPAPs, and Trilogy ventilators since at least 01/31/2020, or earlier, and implemented no further corrective actions until April 2021.

> Polyester polyurethane foam degradation issues concerning CPAPs, BiPAPs, and Trilogy Ventilators were discussed at all [redacted] management review meetings, since the 2019 [redacted], dated 01/31/2020 . . . . Additionally, your firm [Philips] became aware of this issue and related field complaints in at least 2015 or earlier.[90]

## D.    UNTIL THE RECALL, PHILIPS ADVERTISED ITS BREATHING MACHINES AS SAFE AND EFFECTIVE

117.    At no time prior to April 2021, when Philips first disclosed foam issues to its shareholders, did Philips even hint that there was a dangerous defect in its CPAP, BiPAP, and ventilator Recalled Devices. Instead, Philips held itself out as a trusted brand and "global leader in the sleep and respiratory markets."[91] Its branding promised consumers that they will "[b]reath easier, sleep more naturally[.]"[92] Philips further assured consumers that its "sleep therapy systems are designed with the needs of care practitioners and patients in mind," and that its "quality systems reflect [Philips'] commitment to providing enhanced patient comfort," among other things.

---

[89] 518(b) Notice at 10.

[90] 483 Report at 24.

[91] http://www.respironics.com/product_library (last accessed June 16, 2022).

[92] *Id.*

Further, it has long advertised its CPAP and BiPAP Machines as "clinically proven" treatment for sleep disorders.[93]

118.    Philips boasts that it has the "most prescribed CPAP systems by U.S. sleep physicians."[94] Those CPAP and BiPAP machines routinely cost from seven or eight hundred dollars to thousands of dollars per machine, and the ventilators cost more than several thousand dollars per machine.

E.    **PHILIPS BELATEDLY RECALLED ITS DEFECTIVE DEVICES CONTAINING PE-PUR FOAM DUE TO THE SERIOUS HEALTH HAZARDS THAT THEY CAUSE**

1.    **In April and May 2021, Philips Launched the DreamStation 2 and Tried to Convince Patients to Buy It, without Initiating a Recall**

119.    Two months prior to the Recall, on April 13, 2021, Philips announced that it was launching the DreamStation 2, a next-generation machine in its DreamStation product family. The DreamStation 2 does not contain PE-PUR foam.

120.    Less than two weeks after its launch of the DreamStation 2, on April 26, 2021, Philips announced that its previous generation DreamStation products posed serious health risks to users and, in the same release, started trying to convince consumers to purchase its DreamStation 2 device:

> Philips has determined from user reports and testing that there are possible risks to users related to the sound abatement foam used in certain of Philips' sleep and respiratory care devices currently in use. The risks include that the foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone,* and certain environmental conditions involving high humidity and temperature. The majority of the affected devices are in the first-generation DreamStation product family. Philips' recently launched next-generation CPAP platform, DreamStation 2, is not affected. Philips is in the process of engaging with

---

[93] https://www.usa.philips.com/healthcare/solutions/sleep (last accessed June 16, 2022).

[94] *See* https://www.usa.philips.com/healthcare/solutions/sleep/sleep-therapy (last accessed June 16, 2022) (citing 2016 Philips survey).

the relevant regulatory agencies regarding this matter and initiating appropriate actions to mitigate these possible risks. Given the estimated scope of the intended precautionary actions on the installed base, Philips has taken a provision of EUR 250 million.[95]

121.   Philips' April 26, 2021 statement to investors did not disclose the full extent of its knowledge about the risks posed by the PE-PUR foam, and attempted to deflect the blame onto factors such as ozone cleaners. The FDA later rejected this notion, concluding that "***the unreasonable risk associated with the products was not caused by the use of ozone cleaning agents, nor did the use of ozone to clean the products constitute a failure to exercise due care.***"[96]

122.   Meanwhile, Philips continued to conduct tests which confirmed that its breathing products were defective.

123.   For example, on May 17, 2021, Ken Cole from RJ Lee, an industrial forensics analytical laboratory and scientific consulting firm, produced a presentation analyzing the foam in Philips' Trilogy EVO devices. The presentation states that the investigation was "prompted by staff observation of color variance across both current production and previous builds."[97]

124.   The analysis involved six samples of foam, two from units built in 2018 and four taken from Philips' current production stock in May 2021.[98] Some of the samples from 2021 showed "differing cell structure" which is an "[i]ndication of poor process control."[99] The 2021

---

[95] https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2021/philips-first-quarter-results-2021.html (last accessed June 16, 2022).

[96] 518(b) Notice at 10 (emphasis in original).

[97] *See* RJ Lee Analysis Review of Trilogy EVO Foam (Lawler Aff. Exh. A, filed in MDL 3014, Case 2:21-mc-01230-JFC, at Doc. 589-3) (attached as Exhibit "E" hereto), at (WTB 000001-03).

[98] *Id.* at WTB 000006.

[99] *Id.* at WTB 000008.

foam had "significant contaminants."[100] The foam was supposed to be ether-based,[101] but testing

revealed indications that some of the foam was actually ester-based.[102]

### 2.    In June 2021, Philips Finally Recalled Its Defective Devices

125.    Finally, on June 14, 2021, Philips issued a recall notice directed to its customers in

the United States, stating:

> To date, Philips has produced millions of Bi-Level PAP, CPAP and
> mechanical ventilator devices using the PE-PUR sound abatement foam.
> Despite a low complaint rate (0.03% in 2020), Philips determined based on
> testing that there are possible risks to users related to this type of foam. The
> risks include that the PE-PUR foam may degrade into particles which may
> enter the device's air pathway and be ingested or inhaled by the user, and
> the foam may off-gas certain chemicals. The foam degradation may be
> exacerbated by use of unapproved cleaning methods, such as ozone,** and
> high heat and high humidity environments may also contribute to foam
> degradation.
>
> Therefore, Philips has decided to voluntarily issue a recall notification* to
> inform patients and customers of potential impacts on patient health and
> clinical use related to this issue, as well as instructions on actions to be
> taken.[103]

126.    Philips stated that "[t]he majority of the affected devices within the advised 5-year

service life are in the first-generation DreamStation product family."[104] Philips elaborated:

> Based on the latest analysis of potential health risks and out of an abundance
> of caution, the recall notification advises patients and customers to take the
> following actions:
>
> For patients using affected BiLevel PAP and CPAP devices: Discontinue
> use of your device and work with your physician or Durable Medical
> Equipment (DME) provider to determine the most appropriate options for
> continued treatment. To continue use of your device due to lack of

---

[100] *Id.* at WTB 000009; *see also* WTB 000010 ("Indication of poor process control and/or
contamination.").

[101] *Id.* at WTB 000002.

[102] *Id.* at WTB 000013.

[103] Recall Notices (Exhibit "A" hereto).

[104] *Id.*

alternatives, consult with your physician to determine if the benefit of continuing therapy with your device outweighs the risks identified in the recall notification.

For patients using affected life-sustaining mechanical ventilator devices: Do not stop or alter your prescribed therapy until you have talked to your physician. Philips recognizes that alternate ventilator options for therapy may not exist or may be severely limited for patients who require a ventilator for life-sustaining therapy, or in cases where therapy disruption is unacceptable. In these situations, and at the discretion of the treating clinical team, the benefit of continued usage of these ventilator devices may outweigh the risks identified in the recall notification.

**Possible health risks**

The company continues to monitor reports of potential safety issues as required by medical device regulations and laws in the markets in which it operates. To date, there have been no reports of death as a result of these issues. Philips has received reports of possible patient impact due to foam degradation. The potential risks of particulate exposure include headache, irritation, inflammation, respiratory issues, and possible toxic and carcinogenic effects. The potential risks of chemical exposure due to off-gassing include headache, irritation, hypersensitivity, nausea/vomiting, and possible toxic and carcinogenic effects. Philips has received no reports regarding patient impact related to chemical emissions.[105]

127.    On June 14, 2021, the same day as the Recall, Philips provided additional information in an announcement entitled "Clinical information for physicians," which explained that the foam breakdown "may lead to patient harm and impact clinical care."[106] It added that:

While there have been limited reports of headache, upper airway irritation, cough, chest pressure and sinus infection that may have been associated with the foam, based on lab testing and evaluations, *it may be possible that these potential health risks could result in a wide range of potential patient impact, from transient potential injuries, symptoms and complications, as well as possibly serious injury which can be life-*

---

[105] *Id.*

[106] Sleep and respiratory care update: Clinical information for physicians: philips-recall-clinical-information-for-physicians-and-providers.pdf (last accessed June 16, 2022) (emphasis added).

***threatening or cause permanent impairment, or require medical intervention to preclude permanent impairment.***[107]

128.    This announcement detailed two types of hazards from the foam in the devices.

First, the announcement described dangers due to foam degradation exposure:

> **Potential Hazard:** Philips has determined from user reports and lab testing that under certain circumstances the foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user of its Continuous Positive Airway Pressure (CPAP), BiLevel Positive Airway Pressure (BiLevel PAP) and Mechanical Ventilator devices. The foam degradation may be exacerbated by environmental conditions of higher temperatures and humidity in certain regions. Unauthorized cleaning methods such as ozone may accelerate potential degradation.
>
> The absence of visible particles does not mean that foam breakdown has not already begun. Lab analysis of the degraded foam reveals the presence of potentially harmful chemicals including:
>
> - Toluene Diamine
>
> - Toluene Diisocyanate
>
> - Diethylene glycol[108]

129.    Millions of patients across the United States used and trusted the Recalled Devices. Plaintiffs paid all or most of the cost of the vast majority of those patients' purchases or leases of the Recalled Devices. Philips has now revealed that the PE-PUR foam in their breathing machines degrades and exposes patients to toxic particles and gasses.

130.    The fact patients using the Recalled Devices were exposed to toxic and poisonous chemicals cannot reasonably be disputed. According to the Report on Carcinogens, Fifteenth Edition, by the National Toxicology Program in the United State Department of Health and Human

---

[107] Sleep and respiratory care update: Clinical information for physicians: philips-recall-clinical-information-for-physicians-and-providers.pdf (last accessed June 16, 2022) (emphasis added).

[108] *Id.*

Services ("HHS"),[109] toluene diisocyanates are reasonably anticipated to be human carcinogens based on sufficient evidence of carcinogenicity from studies in experimental animals. Administration of commercial-grade toluene diisocyanate (analyzed as 85% 2,4 isomer and 15% 2,6 isomer) by stomach tube caused liver tumors (hepatocellular adenoma) in female rats and mice, benign tumors of the mammary gland (fibroadenoma) and pancreas (islet-cell adenoma) in female rats, and benign tumors of the pancreas (acinar-cell adenoma) in male rats. It also increased the combined incidences of benign and malignant tumors of subcutaneous tissue (fibroma and fibrosarcoma) in rats of both sexes and of the blood vessels (hemangioma and hemangiosarcoma) in female mice.

131.    The HHS Report on Carcinogens also notes that toluene diisocyanates are used primarily to manufacture flexible polyurethane foams for use in furniture, bedding, and automotive and airline seats. The foam in Philips' Recalled Devices is flexible polyurethane foam.

132.    Toluene diamine ("TDA") is classified by the United States Environmental Protection Agency ("EPA") as a probable human carcinogen. The EPA also determined that acute exposure to TDA can produce severe skin and eye irritation, sometimes leading to permanent blindness, respiratory problems (e.g., asthma), rise in blood pressure, dizziness, convulsions, fainting, and coma.

---

[109] https://ntp.niehs.nih.gov/ntp/roc/content/zip15.zip (last accessed June 16, 2022).

133.    The European Union warns that toluene diisocyanate is "fatal if inhaled"[110] and has concluded that toluene diamine "cannot be considered safe for use" even as a hair dye, let alone breathed into the lungs for many hours each night.[111]

134.    Diethylene glycol ("DEG") is a widely used solvent, but there is limited information about its toxicity in humans, despite its historical involvement in mass poisonings around the world. Infamously, DEG caused the death of 100 people across 15 states in the 1937 Elixir Sulfanilamide Incident, which served as a catalyst for the enactment of the Federal Food, Drug, and Cosmetic Act in 1938.[112]

135.    In a July 8, 2021 publication addressed to physicians, Philips disclosed that it "has received several complaints regarding the presence of black debris/particles within the airpath circuit (extending from the device outlet, humidifier, tubing, and mask)." The PE-PUR foam is black, and when it breaks down, it can release black particles.[113]

136.    Philips concluded in its Health Hazard Evaluations ("HHEs") regarding the foam degradation risk, that "[b]ased on the cytotoxicity and genotoxicity results and toxicological risk assessment, combined with [the] conclusion that particles are likely to reach the upper airway and potentially the lower respiratory track, a reasonable worst-case estimate for the general and higher

---

[110] https://echa.europa.eu/substance-information/-/substanceinfo/100.043.369 (last accessed June 16, 2022).

[111] https://ec.europa.eu/health/scientific_committees/consumer_safety/docs/sccs_o_093.pdf (last accessed June 16, 2022), at 5.

[112] https://www.fda.gov/files/about%20fda/published/The-Sulfanilamide-Disaster.pdf (last accessed June 16, 2022).

[113] Sleep and respiratory care update: Clinical information for physicians: philips-recall-clinical-information-for-physicians-and-providers.pdf (last accessed June 16, 2022).

risk (e.g., patient populations with preexisting conditions or comorbidities) patient populations is a severity level 3 (Crucial) for both short/intermediate and long term exposure."[114]

137.    Philips' HHEs note that the harm due to foam degradation "'may not be immediately recognizable and may not be something that the customer would/could report,' adding that certain harms 'may not be easily linked to the hazardous situation or device use in general'— and that in the case of genetic mutations in particular, 'a presumed lag time from exposure to harm development may make it difficult for patients to attribute their individual harm to the device usage.'"[115]

138.    The second hazard posed by the PE-PUR foam in the Recalled Devices is the possibility of VOCs, that is, chemical emissions from the foam. Philips explained:

> **Potential Hazard:** Lab testing performed for and by Philips has also identified the presence of VOCs which may be emitted from the sound abatement foam component of affected device(s). VOCs are emitted as gases from the foam included in the CPAP, BiLevel PAP and MV devices and may have short- and long-term adverse health effects.
>
> Standard testing identified two compounds of concern (COC) may be emitted from the foam that are outside of safety thresholds. The compounds identified are the following:
>
> - Dimethyl Diazine
>
> - Phenol, 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl)-[116]

139.    Philips admitted that the risks of these VOCs include: "irritation and airway inflammation, and this may be particularly important for patients with underlying lung diseases or reduced cardiopulmonary reserve" and may lead to the following symptoms: "headache/dizziness,

---

[114] 518(b) Notice at 3-4.

[115] *Id.* at 5.

[116] Sleep and respiratory care update: Clinical information for physicians: philips-recall-clinical-information-for-physicians-and-providers.pdf (last accessed June 16, 2022).

irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects," as well as "adverse effects to other organs such as kidney and liver."[117]

140.    Corroborating the dangerously defective nature of the Recalled Devices, on July 22, 2021, the FDA upgraded Philips' recall of the Recalled Devices to its most serious classification, Class I, which according to the FDA, means: "A situation in which there is a reasonable probability that the use of or exposure to a violative product will cause serious adverse health consequences or death."[118]

141.    Further, on June 14, 2021, Philips' main competitor, ResMed, issued "[a] message from ResMed's CEO" to the public regarding the Philips Recall. In this notice, ResMed's CEO, Mick Farrell, stated that "ResMed devices are safe to use and are not subject to Philips' recall. ResMed devices use a different material than what Philips uses in their recalled machines."[119]

142.    ResMed PAP devices and ventilators use polyether polyurethane or silicone-based foam for sound abatement purposes, not PE-PUR foam.[120]

143.    On July 8, 2021, Philips released a global supplemental clinical information document based on their own testing of the defective Recalled Devices, stating that, "According to analysis performed by Philips, the majority of particulates are of a size (>8 μm) . . . Smaller particulates (<1-3 μm) are capable of diffusing into deep lung tissue and deposit into the alveoli. During testing performed by an outside laboratory on lab degraded foam, the smallest particulate

---

[117] *Id.*

[118] https://www.fda.gov/safety/industry-guidance-recalls/recalls-background-and-definitions (last accessed June 16, 2022).

[119]  https://www.resmed.com/en-us/healthcare-professional/other-manufacturer-recall-2021/  (last accessed June 16, 2022).

[120] https://www.resmed.com/en-us/other-manufacturer-recall-2021/ (last accessed June 16, 2022).

size identified was 2.69 μm."[121] The Environmental Protection Agency (EPA) notes that exposure to particles less than 10 micrometers can be linked to a variety of health problems including: aggravated asthma, decreased lung function, increased respiratory symptoms, and cardiac related diseases."[122]

144.    The purity of the air coming from a breathing device to a patient is material and highly important to a typical patient. To illustrate, Philips advertises the filtration systems in its devices, noting them on a diagram in its DreamStation Family Brochure.[123] Philips' filtration system, however, does not filter out the particles and VOCs described above.

145.    As this complaint sets forth, Philips has admitted that the Recalled Devices are defective and unsafe. Plaintiffs and Class members have suffered injuries as a result of their payments toward patients' purchases or leases of the Recalled Devices, including substantial economic losses resulting from the payment or reimbursement of the purchase or lease of the Recalled Devices and accessories, as well as replacement machines and accessories, together with consequential damages.

---

[121] Sleep and Respiratory Care update Clinical information (July 8, 2021), accessible at philips-global-supplemental-clinical-information-document.pdf (last accessed June 16, 2022).

[122] https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm (last accessed June 16, 2022).

[123] https://www.documents.philips.com/assets/20180205/15ef65ad106d4ddc88fca87e0134dc60.pdf?_gl=1*1l6jo9f*_ga*MTM1OTI5NDM5Ny4xNjIzODE3MzMz*_ga_2NMXNNS6LE*MTYyNjkxMDEyNC4yMi4xLjE2MjY5MTQyNzkkuMjc.&_ga=2.220564312.1106063144.1626914226-1359294397.1623817333 (last accessed June 16, 2022).

### F.    PHILIPS' INEFFECTIVE MEASURES TO RECALL THE DEVICES

146.    Philips' CEO, Frans van Houten, stated in the Recall announcement: "We deeply regret any concern and inconvenience that patients using the affected devices will experience because of the proactive measures we are announcing today to ensure patient safety."[124]

147.    However, Philips' "recall" was a recall in name only. It did not adequately or effectively provide patients with notice of the defects in, and risks of using, the Recalled Devices, and Philips did not provide patients with new CPAP, BiPAP, or ventilator devices.

#### 1.    Many Patients, Providers, Third-Party Payors, and Others Were Not Notified about the Recall

148.    On March 10, 2022, the FDA issued a Notification Order under § 518(a) of the FDCA.[125] The Notification Order stated that the "FDA has received a number of calls from patients and consumers who contacted FDA to report problems and/or concerns regarding the Recalled Products, but were unaware of the recall and had not been informed of the health risks presented by the Recalled Devices."[126]

149.    The FDA estimated that, after nine months of the Recall, "approximately 50% of patients and consumers who have purchased or received the Recalled Products (excluding ventilators) within the last five years (the service life of the devices) have registered with Philips to obtain a replacement device."[127] But it was "unclear whether the remaining patients and

---

[124] https://www.usa.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (last accessed June 16, 2022).

[125] https://www.fda.gov/media/156811/download (last accessed June 16, 2022).

[126] 518(a) Notification Order at 2.

[127] *Id.*

consumers have not registered because they are unaware of the need to register, or because they do not want or need a replacement device from Philips."[128]

150.    The FDA surveyed 182 consignees to determine whether they had been notified of the Recall and found 28 "who had reported to FDA that they were not aware of the recall."[129] The FDA reported its results to Philips on September 8 and October 29, 2021, and Philips did not respond. On November 22, 2021, Philips stated that it had notified 23 of the 28 consignees of the Recall, but Philips did not "indicate whether the consignees identified by FDA had been sent notification before, or only after, they had been identified by FDA as being unaware of the recall."[130] Moreover, Philips' evidence of notification consisted of delivery confirmation receipts, reflecting delivery of written correspondence to the consignees. As the FDA explained, "[t]ypically, firms demonstrate the effectiveness of its [sic] recall communications through evidence more meaningful than a delivery confirmation receipt, such as a returned response form or a documented telephone conversation."[131]

151.    Throughout the Recall, the FDA "on multiple occasions has informed Philips that FDA was concerned that Philips' efforts to notify patients and consumers, healthcare providers, and consignees regarding the recall have been insufficient," and expressed concern that "it is likely that a significant portion of patients and consumers using the Recalled Products are unaware of the health risks presented by those products."[132]

---

[128] *Id.*

[129] *Id.*

[130] *Id.*

[131] *Id.* at 3.

[132] *Id.*

152.    Noting "Philips' failure to timely provide effective notice to health professionals who prescribe or use the Recalled Products and other persons (including consignees, distributors, retailers, and device users) who should be notified, of the recall and the health risks presented by the Recalled Products," the FDA issued an order under Section 518(a) of the FDCA ordering Philips to "notify all health professionals who prescribe or use the Recalled Products, and other persons (including consignees, distributors, retailers, and device users) who should be notified, of the recall and the health risks presented by the Recalled Products **within the next 45 days**[.]"[133]

### 2.    Philips' Repair/Replacement Program Has Been Extremely Slow

153.    Those patients who registered their Recalled Devices with Philips for the Recall did not immediately receive replacement devices and were not told when replacement devices would be provided.

154.    Philips' June 14, 2021 announcement stated that:

**Repair and replacement program**

Philips is providing the relevant regulatory agencies with required information related to the launch and implementation of the projected correction. The company will replace the current sound abatement foam with a new material and has already begun the preparations, which include obtaining the relevant regulatory clearances. Philips aims to address all affected devices in scope of this correction as expeditiously as possible.

As part of the program, the first-generation DreamStation product families will be modified with a different sound abatement foam and shipped upon receipt of the required regulatory clearances. Philips' recently launched next-generation CPAP platform, DreamStation 2, is not affected by the issue. To support the program, Philips is increasing the production of its DreamStation 2 CPAP devices, that are available in the US and selected countries in Europe.[134]

---

[133] *Id.* at 4 (emphasis in original).

[134] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/philips-issues-recall-notification-mitigate-potential-health-risks-related-sound-abatement-foam (last accessed June 16, 2022).

155.    In actual fact, patients may register their DreamStation Recalled Devices with Philips for the Recall, but Philips has not immediately replaced the defective PE-PUR foam in the DreamStation Recalled Devices. Rather, patients have had to wait, sometimes for many months, for Philips to repair or replace their devices, and many patients are still waiting for a replacement device.

156.    As of the date of this Complaint—about one year after the Recall was announced—Philips continues to repair or replace defective DreamStation 1 Recalled Devices. In other words, the Recall remains ongoing.

157.    The replacement program for the Trilogy devices has been even slower. Philips has only just begun the rework of affected Trilogy 100/200 devices and Philips projects that the process will take approximately 12-14 months to complete.[135]

158.    Philips has not implemented any repair or replacement program for any of its other Recalled Devices.

159.    Due to the design of the Recalled Devices, it is prohibitively difficult for patients to remove or replace the PE-PUR foam themselves. Further, the FDA warns:

> Do **not** try to remove the foam from your device. Trying to or successfully removing the foam may damage the device or change how the device works. It may also lead to more foam or chemicals entering the air tubing of the device.[136]

160.    As a result, the Recall leaves patients without safe, free options. Instead, patients may simply be forced to buy Philips' next-generation product or a competitor's product—at full

---

[135] https://www.usa.philips.com/healthcare/resource-catalog/landing/experience-catalog/sleep/communications/src-update/news/ventilation-news-and-updates (last accessed June 16, 2022).

[136] https://www.fda.gov/medical-devices/safety-communications/faqs-philips-respironics-ventilator-bipap-machine-and-cpap-machine-recalls (emphasis in original) (last accessed June 16, 2022).

price, and indeed, thousands of patients have already done so. Plaintiffs and Class members have

paid the vast majority of those replacement costs.

161.    Thus, Philips intends to profit, and is profiting, from its so-called "recall" by selling

more of its next generation product, the DreamStation 2, to affected patients. Plaintiffs and Class

members are paying the vast majority of those replacement costs. It appears that Philips

intentionally timed the "recall" to coincide with the launch of the DreamStation 2.

162.    The FDA also believes that the Recall is not proceeding quickly enough. It recently

stated:

> Based on the status of Philips' recall as of the date of this letter [May 2, 2022],
> CDRH believes that, if an order were to be issued to Philips under section 518(b),
> the plan submitted by Philips in response to that order should provide for significant
> improvements to Philips' ongoing repair and replacement activities to speed the
> pace of remediation and address other deficiencies identified by CDRH and
> communicated to Philips, to the extent such improvements are achievable by
> Philips.[137]

## V.      CLASS ALLEGATIONS

163.    Plaintiffs bring this action individually and as a class action, pursuant to Fed. R.

Civ. P. 23(a) and 23(b)(3). Specifically, the class defined as the "Nationwide Class" consists of

the following:

> **Nationwide Class:** All third-party health-benefit payors in the United States
> (including its Territories and the District of Columbia) who (i) have been a party to
> a contract, the issuer of a policy, or sponsor of a plan that provides medical coverage
> to natural persons; and (ii) have incurred, pursuant to such contract, policy or plan,
> full or partial costs for Recalled Devices.

164.    Alternatively, and in addition, Plaintiffs seek certification of subclasses defined as,

and more fully set forth below, which are collectively referred to as the "State Subclasses."

165.    Plaintiffs seek certification of a subclass defined as follows ("California Subclass"):

---

[137] 518(b) Notice at 13.

**California Subclass:** All third-party health benefit payors in California who (i) have been a party to a contract, the issuer of a policy, or sponsor of a plan that provides medical coverage to natural persons; and (ii) have incurred, pursuant to such contract, policy or plan, full or partial costs for Recalled Devices.

166.    Plaintiffs seek certification of a subclass defined as follows ("Connecticut Subclass"):

**Connecticut Subclass:** All third-party health benefit payors in Connecticut who (i) have been a party to a contract, the issuer of a policy, or sponsor of a plan that provides medical coverage to natural persons; and (ii) have incurred, pursuant to such contract, policy or plan, full or partial costs for Recalled Devices.

167.    Plaintiffs seek certification of a subclass defined as follows ("Florida Subclass"):

**Florida Subclass:** All third-party health benefit payors in Florida who (i) have been a party to a contract, the issuer of a policy, or sponsor of a plan that provides medical coverage to natural persons; and (ii) have incurred, pursuant to such contract, policy or plan, full or partial costs for Recalled Devices.

168.    Plaintiffs seek certification of a subclass as follows ("Illinois Subclass"):

**Illinois Subclass:** All third-party health benefit payors in Illinois who (i) have been a party to a contract, the issuer of a policy, or sponsor of a plan that provides medical coverage to natural persons; and (ii) have incurred, pursuant to such contract, policy or plan, full or partial costs for Recalled Devices.

169.    Plaintiffs seek certification of a subclass defined as follows ("Massachusetts Subclass"):

**Massachusetts Subclass:** All third-party health benefit payors in Massachusetts who (i) have been a party to a contract, issuer of a policy, or sponsor of a plan that provides medical coverage to natural persons; and (ii) have incurred, pursuant to such contract, policy or plan, full or partial costs for Recalled Devices.

170.    Plaintiffs seek certification of a subclass defined as follows ("Michigan Subclass"):

**Michigan Subclass:** All third-party health benefit payors in Michigan who (i) have been a party to a contract, issuer of a policy, or sponsor of a plan that provides medical coverage to natural persons; and (ii) have incurred, pursuant to such contract, policy or plan, full or partial costs for Recalled Devices.

171.     Plaintiffs seek certification on behalf of a subclass defined as follows ("New York Subclass"):

> **New York Subclass:** All third-party health benefit payors in New York who (i) have been a party to a contract, issuer of a policy, or sponsor of a plan that provides medical coverage to natural persons; and (ii) have incurred, pursuant to such contract, policy or plan, full or partial costs for Recalled Devices.

172.     Plaintiffs seek certification of a subclass defined as follows ("Ohio Subclass"):

> **Ohio Subclass:** All third-party health benefit payors in Ohio who (i) have been a party to a contract, issuer of a policy, or sponsor of a plan that provides medical coverage to natural persons; and (ii) have incurred, pursuant to such contract, policy or plan, full or partial costs for Recalled Devices.

173.     Plaintiffs seek certification of a subclass defined as follows ("Puerto Rico Subclass"):

> **Puerto Rico Subclass:** All third-party health benefit payors in Puerto Rico who (i) have been a party to a contract, issuer of a policy or sponsor of a plan that provides medical coverage to natural persons; and (ii) have incurred, pursuant to such contract, policy or plan, full or partial costs for Recalled Devices.

174.     Plaintiffs seek certification of a subclass defined as follows ("Rhode Island Subclass"):

> **Rhode Island Subclass:** All third-party health benefit payors in Rhode Island who (i) have been a party to a contract, issuer of a policy or sponsor of a plan that provides medical coverage to natural persons; and (ii) have incurred, pursuant to such contract, policy or plan, full or partial costs for Recalled Devices.

175.     Plaintiffs seek certification of a subclass defined as follows ("Texas Subclass"):

> **Texas Subclass:** All third-party health benefit payors in Texas who (i) have been a party to a contract, issuer of a policy, or sponsor of a plan that provides medical coverage to natural persons; and (ii) have incurred, pursuant to such contract, policy or plan, full or partial costs for Recalled Devices.

176.     Plaintiffs seek certification of a subclass defined as follows ("Wisconsin Subclass"):

**Wisconsin Subclass:** All third-party health benefit payors in Wisconsin who (i) have been a party to a contract, issuer of a policy, or sponsor of a plan that provides medical coverage to natural persons; and (ii) have incurred, pursuant to such contract, policy or plan, full or partial costs for Recalled Devices.

177.    Together, the Nationwide Class and the Subclasses shall collectively be referred to here as the "Class." Excluded from the Class are Defendants and their employees, officers, directors, and attorneys, and the Judge(s) and court personnel assigned to this case.

178.    Plaintiffs reserve the right to adjust, modify, or narrow the Class prior to class certification.

179.    The rights of each member of the Class were violated in a similar fashion based upon Defendants' uniform actions and unlawful course of conduct.

180.    This action has been brought and may properly be maintained as a class action for the following reasons:

a.    <u>Numerosity</u>: Members of the Class are so numerous that their individual joinder is impracticable. The proposed Class contains at least hundreds of TPPs who purchased, provided repayment, provided payment for a lease of these Recalled Devices for the TPPs' beneficiaries. The Class is therefore sufficiently numerous to make joinder impracticable, if not impossible. The precise number of Class members is unknown to Plaintiffs at this time, but the Class members are readily ascertainable and can be identified by Philips' records and records of third parties, such as durable medical equipment providers.

b.    <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Class. These questions predominate over any questions affecting only individual Class members. These common legal and factual questions include, without limitation:

i.    Whether Defendants violated RICO by selling the Recalled Devices;

ii.     Whether Defendants were unjustly enriched by the sale of Recalled Devices;

iii.    Whether Defendants failed to warn consumers regarding the risks of the Recalled Devices;

iv.    Whether the Recalled Devices suffer from a design defect;

v.     Whether Philips violated express or implied warranties in selling the Recalled Devices;

vi.    Whether Philips' practices constitute unfair or deceptive acts or practices under state consumer protection statutes;

vii.   The appropriate nature of class-wide equitable relief;

viii.  The appropriate measurement of restitution and/or measure of damages to Plaintiffs, and members of the Class;

ix.    The appropriate measure of statutory damages; and

x.     Whether Plaintiffs are entitled to punitive damages.

These and other questions of law or fact that are common to the Class members' claims predominate over any questions affecting only individual Class members.

c.     <u>Typicality</u>: Plaintiffs' claims are typical of the claims of all members of the Class.

d.     <u>Adequacy</u>: Plaintiffs are adequate representatives of the Class because (1) their interests do not conflict with the interests of the Class they seek to represent, (2) they have retained counsel competent and experienced in complex class action litigation, and (3) both Plaintiffs and their counsel intend to vigorously prosecute this action. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

e.     <u>Superiority</u>: A class action is superior to other available means for the fair and efficient adjudication of the Plaintiffs' and Class members' claims. The injury suffered by each Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would

be virtually impossible for the Class members to individually and effectively redress the wrongs they have suffered. Even if any Class members could afford such individual litigation, the court system cannot. Individualized litigation would pose the risk of inconsistent or contradictory judgments. Individualized litigation also would increase the delay and expense to all parties, and to the court system, which are inherent in the complex nature of this case. By contrast, the class action device presents far fewer management difficulties, and will provide the benefit of a single adjudication, an economy of scale, and comprehensive supervision by a single court.

## VI.    EQUITABLE TOLLING OF STATUTES OF LIMITATIONS

181.    The running of any statute of limitations has been equitably tolled by Defendants' fraudulent concealment and/or omissions of critical safety information. Through its affirmative misrepresentations and omissions, Philips actively concealed from Plaintiffs, their vendors and contracted physicians, the true risks associated with the Recalled Devices.

182.    As a result of Defendants' actions, Plaintiffs were unaware, and could not reasonably have known or learned through reasonable diligence, that their Enrollees had been exposed to the risks and harms set forth herein, and that those risks and harms were the direct and proximate result of Defendants' acts and omissions.

## VII.    CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(C), AGAINST PHILIPS AND POLYTECH
### On behalf of the Nationwide Class and all Subclasses[138]

183.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth here.

---

[138] Plaintiffs will submit a RICO case statement pursuant to Local R. Civ. P. 7.1.B within 14 days.

184.    This claim is brought by Plaintiffs against Philips and PolyTech (the "RICO Defendants") for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964, for violations of 18 U.S.C. § 1961, *et seq.*

185.    Pursuant to 18 U.S.C. § 1962(c): "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

186.    At all relevant times, each RICO Defendant is and has been a "person" under 18 U.S.C. § 1961(3) because each was capable of holding "a legal or beneficial interest in property."

187.    The RICO Defendants each violated 18 U.S.C. § 1962(c) and injured the business or property of the Plaintiffs and the Nationwide Class. Each Plaintiff is a "person" as defined in 18 U.S.C. § 1961(3). Further, all Plaintiffs have standing to sue under 18 U.S.C. § 1964(c) because they were and are being injured in their business and/or property "by reason of" the RICO violations alleged herein.

a.    **The RICO Defendants Conducted and Participated in the Affairs of an Association-In-Fact Enterprise With A Common Purpose To Conceal The Health And Safety Risks Of The Recalled Devices**

188.    The RICO Defendants conducted or participated in the affairs of an "association-in-fact enterprise"—*i.e.*, the RICO Defendants' Enterprise—through a pattern of racketeering activity (comprised of predicate racketeering acts of mail and wire fraud) in violation of 18 U.S.C. § 1962(c). The RICO Defendants' Enterprise engaged in this pattern of illegal activities in furtherance of its common purpose to unlawfully defraud and mislead the FDA, prescribers, third-party payors, hospitals, and consumers about the safety of the Recalled Devices. In so doing, each

of the RICO Defendants knowingly conducted and participated in a pattern of mail and wire fraud in violation of 18 U.S.C. ¶¶ 1962(c) and (d).

189.    The RICO Defendants' Enterprise included the RICO Defendants, as well as other nonparty individuals and corporations, including Paramount Die. Discovery will likely reveal additional members of the RICO Defendants' Enterprise that are not currently known to Plaintiffs.

190.    Each RICO Defendant participated in the RICO Defendants' Enterprise, played a distinct role in furthering the enterprise's common purpose of increasing profits, and knowingly concealed information about the safety of the Recalled Devices.

191.    Specifically, the RICO Defendants worked together to coordinate the enterprise's goals, conceal the existence of the enterprise, and conceal their individual roles. Further, each of the RICO Defendants were linked through their business relationships and continuing coordination of activities. This business relationship facilitated the formation of a common purpose among the RICO Defendants, who each agreed to participate in the conduct of their RICO Enterprise. Each RICO Defendant played a critical role in producing the Recalled Devices, concealing the devices' defective condition, and selling the devices to third-party payors, hospitals and consumers.

192.    At all relevant times, the RICO Defendants' Enterprise: (i) had an existence that was separate and distinct from the individual RICO Defendants and their members; (ii) was separate and distinct from the pattern of racketeering in which the individual RICO Defendants engaged; (iii) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including each of the RICO Defendants; (iv) was characterized by business relationships between and among each of the RICO Defendants; and (v) had sufficient longevity for the Enterprise to pursue its common purpose and function as a unit.

193.   The RICO Defendants participated in the conduct of the RICO Defendants' Enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).  This was done to increase profits by hiding and misrepresenting the dangers associated with the Recalled Devices.

194.   The RICO Defendants' Enterprise engaged in and affected interstate commerce because it manufactured, marketed, sold, or provided the Recalled Devices to millions of individuals throughout the United States.

### b.   The RICO Defendants' Enterprise Had A Common Purpose

195.   The RICO Defendants' Enterprise came together for the common purpose of perpetuating a fraudulent scheme to conceal from patients, prescribers, third-party payors, hospitals, and the FDA the serious health and safety risks of the Recalled Devices and PE-PUR foam. This concealment was aimed at allowing the Enterprise participants to profit, continue to profit, and retain profits from the sale of Recalled Devices.

196.   By knowingly concealing and minimizing the defective nature of the Recalled Devices, the RICO Defendants could (and did) misrepresent the devices as being safe and effective, which included failing to disclose material information to the contrary. This false representation resulted in significant revenue from sales of the Recalled Devices. Concealing and minimizing their defects also allowed the RICO Defendants to avoid or limit the substantial costs and reputational harm associated with a recall, repair or replacement of the Recalled Devices.

197.   Each of the RICO Defendants profited, directly or indirectly, from the scheme. These profits were substantially greater than they would have been if the Defect and true risks of the Recalled Devices had been disclosed.

    a.      Philips profited directly from the sales of the Recalled Devices, which resulted from the Enterprise's deception of consumers, prescribers, third-party payors, hospitals, and the FDA.

    b.      Likewise, PolyTech profited from the sale of the Recalled Devices that contained the PE-PUR foam cut and sold by PolyTech.

    c.      Paramount Die likewise profited from the sale of the Recalled Devices that contained the PE-PUR foam modified by Paramount Die for use in the Recalled Devices.

198.    Because the RICO Defendants' ability to profit from this scheme depended on the prescription and sale of the Recalled Devices, the RICO Defendants' Enterprise needed to ensure complete allegiance to a false premise: that the Recalled Devices were safe and effective. For this scheme to work, it was essential for the RICO Defendants' Enterprise to conceal the Defect from the FDA, because the agency could otherwise investigate, recall the devices, and notify the public of the Defect. The expense of a recall and resulting inability to sell the defective Recalled Devices would undermine the profitability of the scheme.

199.    This common purpose served the interests of all of the RICO Defendants.

**c.    The RICO Defendants' Enterprise Had an Ongoing Organization**

200.    The RICO Defendants, in concert with the other Enterprise participants, created and maintained systematic links to serve this common purpose, *i.e.*, to manufacture, market, and sell the Recalled Devices while concealing their health and safety risks.

201.    The RICO Defendants' Enterprise continued for several years, from at least 2015 to the present. During this time, the RICO Defendants remained stable, with Philips, PolyTech, and Paramount Die actively producing, marketing, and selling the defective Recalled Devices.

202.    At all relevant times, the RICO Defendants exerted control over the Enterprise and coordinated and participated in the operation or management of Enterprise affairs, which included lawful and unlawful activities and did not exist solely to commit unlawful acts. At the same time, the RICO Defendants were and are separate entities existing outside the Enterprise. The RICO Defendants' independent existence is demonstrated by the following:

a.    During the relevant period, Philips contemporaneously designed, manufactured and sold many medical devices and products separate and apart from the Recalled Devices.

b.    During the relevant period, PolyTech contemporaneously sold and distributed many other noise abatement products aside from the PE-PUR foam used in the Recalled Devices.

c.    During the relevant period, Paramount Die contemporaneously provided cutting services for rubber, foam, plastic and other materials apart from the PE-PUR foam used in the Recalled Devices.

203.    The RICO Defendants also occupied delineated roles that furthered the organization's goals. Each RICO Defendant performed important but separate roles within the RICO Defendants' Enterprise.

204.    Philips participated in the conduct of the Enterprise when it, among other things:

a.    Designed, marketed, manufactured, and sold the Recalled Devices;

b.    Coordinated with PolyTech and Paramount Die to select and order the PE-PUR foam to use for sound abatement in the Recalled Devices;

c.     Downplayed, ignored, and failed to investigate issues of foam degradation in its devices using PE-PUR foam for sound abatement, including failing to perform and document required risk analyses;

d.     Obscured and minimized the defect in the Recalled Devices by misleadingly blaming other factors, such as the use of ozone cleaners, when faced with recurring evidence of serious problems (*e.g.*, including consumer complaints of "black dust" and related issues);

e.     Communicated and coordinated regularly with PolyTech about known instances of foam degradation and consumer complaints for devices with PE-PUR foam, beginning at least as early as 2015;

f.     Failed to implement a preventative maintenance procedure for Trilogy ventilator devices with PE-PUR foam that another Philips entity successfully instituted;

g.     Concealed the fact that the Recalled Devices were equipped with defective PE-PUR foam that could degrade and emit dangerous VOCs; and

h.     Collected revenue because of the sale of the Recalled Devices.

205.     PolyTech participated in the conduct of the Enterprise when it, among other things:

a.     Obtained bulk PE-PUR foam from Burnett, and cut, shipped, and sold PE-PUR foam for installation in the Recalled Devices;

b.     Disregarded specific warnings from Burnett about PE-PUR foam, and continued to obtain and sell the defective PE-PUR foam for use in the Recalled Devices;

c.    Relayed communications from Philips to Burnett, including as to questions about the PE-PUR foam chemistry and the safety risks, field issues, and testing for the Recalled Devices;

d.    Concealed the fact that the Recalled Devices were equipped with defective PE-PUR foam that could degrade and emit dangerous VOCs;

e.    Misrepresented the PE-PUR foam in the Recalled Devices to be effectively resistant to heat and humidity;

f.    Communicated with Philips about known instances of foam degradation and consumer complaints for devices with PE-PUR foam; and

g.    Collected revenue because of the sale of the Recalled Devices.

206.    In addition, each of the RICO Defendants separately ensured that the FDA, prescribers, third-party payors, hospitals, and consumers did not discover the Defect in the Recalled Devices.

207.    Without the RICO Defendants' willing and knowing participation in the unlawful conduct alleged above, the Enterprise's scheme and common course of conduct would have been unsuccessful.

208.    The participants' dedication of personnel to the Enterprise's scheme further evidences the ongoing structure of the Enterprise. For example,

a.    PolyTech dedicated its employees Bob Marsh and Bonnie Peterson to work with Philips regarding the PE-PUR foam in the Recalled Devices, and to coordinate their communications with Burnett on behalf of Philips. Ms. Peterson served as a regular point of contact for technical questions about the PE-PUR foam, while Mr. Marsh liaised with Philips' personnel on foam

62

degradation issues and questions. Likewise, PolyTech dedicated its employee Michael Haupt to coordinate with Paramount Die.

b.    Philips dedicated key personnel to the Recalled Devices' design, marketing or sale, and/or to contacting PolyTech. This included Vince Testa, who attended internal meetings on foam degradation issues and was then designated as a point of contact for PolyTech as a follow-up to those meetings.

c.    Establishing these regular points of contact further organized the Enterprise.

209.    The RICO Defendants were aware of each other member's involvement with the Enterprise and furthered its goals by committing unlawful and fraudulent, predicate acts of mail and wire fraud. Accordingly, each member of the Enterprise benefited from the existence and involvement of the others.

        **d.    The RICO Defendants Committed At Least Two Predicate Acts Of Mail And Wire Fraud In Furtherance Of The Enterprise's Fraudulent Scheme**

210.    The RICO Defendants devised and conducted an unlawful scheme to defraud consumers, prescribers, third-party payors, hospitals, and the FDA by falsely concealing or minimizing defects in the Recalled Devices.

211.    In addition, the RICO Defendants devised and conducted an unlawful scheme to obtain money by fraudulent pretenses and maximize sales of the Recalled Devices. This scheme financially enriched the RICO Defendants.

212.    In furtherance of the scheme, the RICO Defendants knowingly conducted or participated, directly or indirectly, in their RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c). Specifically, the RICO

Defendants committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity within the past ten years, which constituted a pattern of racketeering activity. This pattern of racketeering activity was made possible by the RICO Defendants' regular use of the facilities, services, distribution channels and employees of the RICO Defendants' Enterprise, the U.S. Mail and interstate wire facilities. The RICO Defendants participated in the scheme to defraud by using mail, telephones and the Internet to transmit mailings and wires in interstate or foreign commerce.

213.    The RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications to further the Enterprise's unlawful goals through material misrepresentations, concealments, and omissions.

214.    The RICO Defendants caused such mailings and uses of the wires to be made both by directly making or approving fraudulent statements and by setting in motion a scheme to defraud that would reasonably lead to those mailings and wires. These multiple acts of racketeering activity were related to each other, pose a threat of continued racketeering activity, and constitute a pattern of racketeering activity.

215.    The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

> a.    Mail Fraud: The RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the Recalled Devices through false pretenses and promises, and material misrepresentations and omissions.

b.    Wire Fraud: The RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money through false pretenses and promises, and material misrepresentations and omissions.

216.    The RICO Defendants' uses of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by the RICO Defendants or third parties that were foreseeably caused to be sent in furtherance, and as a result, of the RICO Defendants' unlawful scheme to defraud:[139]

a.    Shipments by Philips of the Recalled Devices, known to be defective, to locations throughout the United States for distribution and sale. Plaintiffs do not have access to the confidential records that provide the precise dates and locations of these shipments, which occurred in each year between 2015-2021. The Recalled Devices transported in interstate commerce were misbranded, in violation of 21 U.S.C. § 352.

b.    Shipments from PolyTech to Philips (including shipments via Paramount Die) of PE-PUR foam for installation in the Recalled Devices, with knowledge that Philips would use the foam in the Recalled Devices and distribute them throughout the United States using interstate carriers. Plaintiffs do not have access to the confidential records that provide the

---

[139] Many of the precise dates and examples of Defendants' uses of the mails and interstate wires to further their fraudulent scheme cannot be more specifically alleged without access to Defendants' books and records. However, Plaintiffs have described the predicate acts of mail and wire fraud that Defendants committed and, in some instances, when those predicate acts occurred.

precise dates and locations of these shipments, which occurred in each year between 2015-2021.

c.  Shipments by Burnett to PolyTech of bulk PE-PUR foam sheets by private or commercial interstate carrier for use in the Recalled Devices. PolyTech caused Burnett to make these shipments when it ordered the bulk foam, knowing it would then transmit the foam for installation in the Recalled Devices. Plaintiffs do not have access to the confidential records that provide the precise dates and locations of these shipments, which occurred in each year between 2015-2021. Documents provided to date from Burnett provide the particulars of at least one such shipment, which originated from Burnett in Baltimore, Maryland and was shipped to PolyTech in Newark, Delaware, on or about March 12, 2021.[140]

d.  Advertisements, brochures, labeling, and marketing from Philips that omitted the known health and safety risks of the Recalled Devices, which were distributed using mail, wire, radio, or television communications in interstate commerce. This includes transmission of statements from Philips that its "sleep therapy systems are designed with the needs of care practitioners and patients in mind," and the numerous other misrepresentations regarding safety and efficacy cited above. *See* ¶¶ 116-17, *supra*. Each such mailed advertisement—including brochures or print advertisements—violated the mail fraud statute (18 U.S.C. § 1341). Each

---

[140] *See* Purchase Order dated 3/12/2021 and supporting documentation (Lawler Aff. Exh. B, filed in MDL 3014, Case 2:21-mc-01230-JFC, at Doc. 589-4) (attached hereto as Exhibit "F"), at WTB 000015-50.

such internet-based, radio, and television advertisement violated the wire fraud statute (18 U.S.C. § 1343). Philips knew or recklessly disregarded the fact that its advertisements about the Recalled Devices were misleading and omitted material information, but still disseminated the advertisements to ensure the continued success of the Enterprise in selling the Recalled Devices.

e.    Advertisements and marketing from PolyTech for the PE-PUR foam used in the Recalled Devices, including marketing that falsely misrepresented the foam to have "superior physical properties and offer excellent resistance to heat, moisture, and chemicals." FN 65, *supra*. Each such mailed advertisement was a violation of the mail fraud statute (18 U.S.C. § 1341). Each such internet-based, radio, and television advertisement was a violation of the wire fraud statute (18 U.S.C. § 1343). PolyTech knew its advertisements were misleading and omitted material information, but still disseminated the advertisements to ensure the continued sale of the Recalled Devices.

f.    Documents necessary to facilitate the sale and transmission of bulk PE-PUR foam from Burnett for use in the Recalled Devices, including invoices, packing lists, labels, invoices, and test reports.[141] Each RICO Defendant knew that these documents would foreseeably result in the manufacture and

---

[141] *See* Lawler Aff., filed in MDL 3014, Case 2:21-mc-01230-JFC, at Doc. 589-1 (attached hereto as Exhibit "G"), at ¶ 20; *see also* Purchase Orders and supporting documentation (Lawler Aff. Exh. B) (Exhibit "F" hereto), at WTB 000015-50.

sale of the Recalled Devices, thereby furthering the scheme to continue to make and sell them without disclosing the Defect.

g.    Documents necessary to facilitate the manufacture and sale of the Recalled Devices, including bills of lading, invoices, shipping records, reports and correspondence. Each of the RICO Defendants knew that these documents would foreseeably result in the manufacture and sale of the Recalled Devices, thereby furthering the scheme to continue to make and sell them without disclosing the defect.

h.    Documents necessary to process and receive payments for the Recalled Devices by unsuspecting Plaintiffs and Class members, including invoices and receipts. Each of the RICO Defendants knew that these documents were the foreseeable result of the manufacture and sale of the Recalled Devices, thereby furthering their scheme to continue to make and sell them without disclosing the Defect.

i.    False or misleading communications, internally among the RICO Defendants and externally with third parties including Burnett, that obscured the defect and prevented regulators and the public from discovering the true risks of the Recalled Devices, and/or purposely misrepresented that external factors, such as ozone cleaners, were the cause of problems in the Recalled Devices.

j.    While using mail and wire to defraud and obtain revenue under false pretenses, the RICO Defendants failed to timely, accurately, and completely

disclose the Defect and associated risks in the Recalled Devices when the RICO Defendants had a duty to disclose this information.[142]

217.    The RICO Defendants (or their agents), in furtherance of their illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of the Recalled Devices and related documents and communications. Because the RICO Defendants disguised their participation in their unlawful RICO Enterprise and worked to keep its true purpose secret, while deliberately fostering the false impression that the Recalled Devices were safe, many of the precise dates of the Enterprise's use of U.S. Mail and interstate wire facilities (and corresponding predicate acts of mail and wire fraud) cannot be alleged without access to the RICO Defendants' records. Indeed, an essential part of the successful operation of the RICO Defendants' Enterprise required secrecy. Despite this, Plaintiffs are aware of, and allege the following occasions when the RICO Defendants disseminated misrepresentations and false statements to consumers, prescribers, regulators, and Plaintiffs, and how those acts advanced the scheme:

| From | To | Date | Description |
| --- | --- | --- | --- |
| Philips | PolyTech | October 30, 2015 | Email message from Philips to PolyTech sharing information and implying that a customer made Philips aware of PE-PUR foam degradation issues. |
| PolyTech | Burnett | October 30, 2015 | Email message from PolyTech to Burnett transmitting information from Philips about PE-PUR foam degradation issues. |

---

[142] As explained below, Philips and PolyTech breached multiple, independent duties to disclose material information about the Recalled Devices.

| Philips entity | Philips | November 25, 2015 | Communications transmitting information about a preventative maintenance servicing procedure implemented on Trilogy devices by a Philips entity, which resulted in no documented further investigation, risk analysis, or design review.[143] |
| Bob Marsh, PolyTech | Lee Lawler, Burnett | August 5, 2016 | Email message from Bob Marsh of PolyTech to Lee Lawler of Burnett, referring to questions from Philips, and admitting that PolyTech would inform Philips of risks of PE-PUR foam raised by Burnett in 2016. |
| Philips | | April 1, 2016 to January 22, 2021 | Documents and communications sharing results of at least fourteen instances, assessments, and/or test reports, where Philips was aware of issues and concerns related to potential foam degradation and/or Volatile Organic Compound (VOC) emissions, with various Sleep and Respiratory care devices. |
| Vincent Testa, Philips | Bonnie Peterson, PolyTech | April 20, 2018 | Email reporting consumer complaints that PE-PUR foam in Trilogy devices was "disintegrating" and admitting it was a "potential safety concern." |
| Bob Marsh, PolyTech | Lee Lawler, Burnett | April 23, 2018 | Email correspondence regarding degradation of ester foam, and forwarding email |

---

[143] 483 Report at 2.

| | | | from Vince Testa of Philips regarding the same.[144] |
|---|---|---|---|
| Bob Marsh, PolyTech (with Bonnie Peterson and Mike Haupt, PolyTech) | Lee Lawler, Burnett | May 2, 2018 and May 4, 2018 | Email correspondence confirming Philips' test results for ether vs. ester foam confirming that ether was the "better performer" but nonetheless raising Philips' and PolyTech's plan to continue using ester foam.[145] |
| Philips | | May 22, 2018 | Communications to prepare Philips' Biological Risk Assessment document, which was deemed "inadequate" by the FDA because it did not "accurately reflect known data" about PE-PUR foam degradation in Trilogy ventilator devices.[146] |
| Philips | | May 2018 | Communications to prepare Philips' Health Hazard Evaluation, ER22227646, which was deemed "inadequate" by the FDA because it did not "accurately reflect known data" about PE-PUR foam degradation in Trilogy ventilator devices. |
| Philips | | June 2018 | Communications to close CAPA INV 0988 related to Trilogy Devices without reference to other CPAP and |

---

[144] *See* Email from Vince Testa at Philips to Bonnie Peterson at PolyTech dated 4/20/2018, forwarded from Bob Marsh at PolyTech to Lee Lawler at Burnett on 4/23/2018 (Lawler Aff. Exh. D, filed in MDL 3014, Case 2:21-mc-01230-JFC, at Doc. 589-6) (attached hereto as Exhibit "H"), at WTB 000054-55.

[145] *See* Email correspondence by and among Vince Testa at Philips, Bob Marsh and Bonnie Peterson at PolyTech, and Lee Lawler at Burnett (Lawler Aff. Exh. G, filed in MDL 3014, Case 2:21-mc-01230-JFC, at Doc. 589-9) (attached hereto as Exhibit "I"), at WTB 000061-65.

[146] 483 Report at 12.

| | | | |
|---|---|---|---|
| | | | BiPAP devices, including the Recalled Devices despite knowledge of consumer complaints of foam degradation in those devices. |
| Philips | | August 24, 2018 | Intra-company email amongst Philips personnel discussing testing that confirmed that the affected foam breaks down in high heat and high humidity environments, which concurred with Trilogy ventilator related complaints received. |
| Philips | | December 12, 2018 | Communications transmitting test results that acknowledged a "problem of degradation" in PE-PUR foam in Trilogy devices as a result of field reports/complaints, following which "no further design change, corrective action, or field correction was conducted" for the Recalled Devices for at least three years.[147] |
| Philips | | June 2019 | Documents and communications for inadequate formal CAPA 7211 investigation that excluded known medical device reports and complaints. |
| Philips | | April 26, 2021 | Press release admitting to serious health risks of the Recalled Devices but misleadingly casting blame on other "factors" such as ozone cleaners. |

---

[147] 483 Report at 5.

218.    Each of the predicate acts alleged above had the common purpose of generating significant revenue and profits for the RICO Defendants from the sale of defective Recalled Devices. This unlawful purpose was furthered by concealing from patients, prescribers, third-party payors and the FDA the true health risks and fundamental defects in the Recalled Devices. This common purpose also was furthered by the above-described instances of the RICO Defendants' sharing information and evidence about the Defect among the Enterprise. This sharing of information allowed the RICO Defendants to coordinate their actions and efforts to conceal.

219.    The RICO Defendants' pattern of racketeering activity and their RICO Enterprise are separate and distinct from each other. Likewise, the RICO Defendants are distinct from the RICO Enterprise.

220.    The RICO Defendants' racketeering activities constituted a common course of conduct, with a similar pattern and purpose, which was intended to deceive consumers, prescribers, regulators, and Plaintiffs. Each of the RICO Defendants' uses of the U.S. Mail and/or interstate wire facilities were related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including consumers, prescribers, regulators and Plaintiffs. The RICO Defendants engaged in this pattern of racketeering activity for the purpose of conducting the unlawful business affairs of the Enterprise.

221.    Each of the RICO Defendants aided and abetted the others, which renders them principals in the Enterprise's violations of 18 U.S.C. §§ 1341 and 1343.

222.    The RICO Defendants engaged in a pattern of related and continuous predicate acts for years. Each of the predicate acts was committed for the common purpose of obtaining revenue from the marketing and sale of the defective Recalled Devices. Each of the predicate acts had the

same or similar results, participants, targeted pool of victims, and methods of commission. The predicate acts were related and not isolated.

### e. The RICO Defendants Advanced their Fraudulent Scheme by Concealing Material Information they Had a Duty to Disclose about Serious Safety Risks Posed by the Defective Recalled Devices

223.    The RICO Defendants' uses of the mails and wires alleged above violated the mail and wire fraud statutes because they furthered a fraudulent scheme to mislead consumers, prescribers, third party payors, hospitals, and the FDA about the Recalled Devices.

224.    Those same uses of the mails and wires also were unlawful because the RICO Defendants had a duty to disclose the health and safety risks posed by the defective Recalled Devices. The RICO Defendants failed to disclose this critical information in furtherance of their unlawful scheme.

225.    For years, each RICO Defendants knew of the risks and safety concerns inherent in the Recalled Devices. The RICO Defendants knew about PE-PUR foam degradation issues in the field at least as early as 2015—six years before the public recall announcement. To further the goals of the RICO Defendants' Enterprise and their mutual monetary gain, the RICO Defendants failed to disclose the existence, scope, and material safety risks of the Defect in the Recalled Devices and continued to manufacture and sell them for years despite that knowledge.

226.    The RICO Defendants' concerted efforts to conceal the Defect and risks of the Recalled Devices were critically important to the viability of their scheme. A decision by any one RICO Defendant to tell the truth about the Defect would have threatened the very existence of the Enterprise. Instead, each RICO Defendant kept key information about the Recalled Devices' known risks and issues hidden for years, which advanced their unlawful scheme to continue profiting while avoiding costly recalls and damage to their reputations among consumers.

227.    The RICO Defendants' failure to disclose the known safety risks posed by the Defect in the Recalled Devices violated several independent duties to disclose:

a.    As a medical device manufacturer, Philips had a duty to disclose material facts about the safety risks of its devices to physicians, patients, payors, and the FDA. This includes Philips' statutory and regulatory duties under 21 U.S.C. § 352 (FDCA); 21 C.F.R. § 820.70 and 21 C.F.R. § 803.

b.    Each RICO Defendant also had a duty to disclose the Defect in the Recalled Devices because of their exclusive knowledge and far superior information. The RICO Defendants knew about the risks to users of the Recalled Devices from the PE-PUR foam, which they gathered through their exclusive access to information about their design, development, and testing, and through their confidential and proprietary investigations following consumer complaints. Plaintiffs, by contrast, did not (and do not) have the sophisticated expertise that would be necessary to discover the Defect and its risks and dangers.

c.    The RICO Defendants' affirmative steps to conceal the Defect deprived Plaintiffs and Class Members of an opportunity that otherwise could have led to their discovery of the truth. The RICO Defendants also each had a duty to disclose because of the actions they took to conceal the Defect in the Recalled Devices, which was a material fact. Philips acted to suppress the truth including when it inappropriately limited and closed its CAPA investigations (thus avoiding a written record), omitted relevant data from its Biological Risk Assessments, and attempted to blame independent

factors such as ozone cleaners for the Defect. PolyTech also suppressed the truth when it corresponded with Burnett about the known risks of PE-PUR foam and took no action, and instead continued to supply the foam to Philips for use in the Recalled Devices.

d.    Finally, Philips affirmatively disclosed some, but not all material information about the Recalled Devices, including the information set forth in ¶¶ 214 and 215 above. Because Philips chose to make those representations, and because it possessed other information about the Recalled Devices that made those representations misleading, Philips was under a separate duty to disclose the truth about the Defect that materially qualified the information it chose to provide.

228.    The RICO Defendants knew and intended that Plaintiffs would rely on their and the other Enterprise members' material omissions when they paid for the Recalled Devices that patients used. Plaintiffs' reliance on this concealment is demonstrated by their payment of money for defective Recalled Devices that never should have been put into the U.S. stream of commerce.

**f.    The RICO Defendants' Enterprise's Pattern of Racketeering Injured Plaintiffs and The Nationwide Class Members in Their Business or Property When They Paid for Defective Recalled Devices**

229.    Each of the Plaintiffs and Nationwide Class members is a "person injured in his or her business or property" by reason of the Enterprise's RICO violations, within the meaning of U.S.C. § 1964(c). Plaintiffs and Nationwide Class members have the right to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

230.    As a proximate result of the RICO Defendants' Enterprise's pattern of racketeering activity, Plaintiffs and Nationwide Class members have been injured in their business and/or property by paying for Recalled Devices with an undisclosed safety defect. Because of this Defect, Plaintiffs paid money for Recalled Devices that had no actual value at the time of purchase.

231.    As such, the RICO Defendants' Enterprise directly or indirectly obtained money from Plaintiffs and the Nationwide Class by means of materially false or fraudulent misrepresentations and omissions of material facts. If the Plaintiffs and Class members had known what the RICO Defendants knew about the Recalled Devices, they would not have paid for the Recalled Devices.

232.    The RICO Defendants' violations of law and their pattern of racketeering activity directly and proximately caused injury to Plaintiffs' and Nationwide Class members' business and property. The RICO Defendants' pattern of racketeering activity logically, substantially, and foreseeably caused third party payors, hospitals, and consumers to purchase and pay for the Recalled Devices.  The Plaintiffs' and Nationwide Class members' injuries were not unexpected, unforeseen, or independent. Rather, the RICO Defendants knew that the Recalled Devices were defective and unsafe. Regardless of these known risks, the RICO Defendants used the mails and wires to carry out their scheme of deception, thereby reaping increased profits.

233.    If the RICO Defendants had disclosed their knowledge of the defects in the Recalled Devices and informed the FDA and the public, Plaintiffs would have learned of the disclosure and made informed decisions about their health.

       e.    Had any of the RICO Defendants disclosed the Recalled Devices' defective condition to the FDA, the FDA would have considered the information material, and would have informed consumers. This is evidenced by the

FDA's classification of the recall as a Class I recall after Philips finally disclosed the defect it had long concealed.

f.      Had the RICO Defendants disclosed the Recalled Devices' defective condition to the public, either through press releases, their websites, or in any other public forum, Plaintiffs and Nationwide Class members would have learned of the Defect. Further, given the seriousness of the information and the number of devices affected, the news media and consumer forums would have published this information.

g.      Had the RICO Defendants disclosed the defective nature of the Recalled Devices via any of the channels typically used to communicate such information, Plaintiffs and Nationwide Class members would have learned about the Defect.

234.    The RICO Defendants' Enterprise's materially misleading statements and omissions to the FDA and to the TPPs that paid for or reimbursed patients for the Recalled Devices were essential to the scheme. The FDA would have considered information about the defective PE-PUR foam material (as evidenced by its Class I classification of the ongoing recall), prescribers would not have prescribed dangerous and defective breathing machines to their patients, and the TPPS would not have paid for, or reimbursed patients for buying them. At the very least, the RICO Defendants' misleading statements delayed the FDA's broader investigation of the Recalled Devices, thereby increasing the RICO Defendants' unlawful profits from their sale.

235.    In the case of fraud on third parties (i.e., the FDA, prescribers and TPPs), the RICO Defendants' omissions and misrepresentations to those third parties facilitated Plaintiffs' and Nationwide Class members' purchase of defective and unsafe products that should not have been

on the market. Unlike the Plaintiffs and Nationwide Class members, The FDA and prescribers did not suffer any direct injury as a result of the RICO Defendants' violations.

236.    As purchasers and payors for the Recalled Devices, Plaintiffs and the Nationwide Class are the parties most (and directly) affected by the RICO Defendants' misconduct. The RICO Defendants knew that their concealment of the risks would cause Plaintiffs and the Nationwide Class to pay for the Recalled Devices that exposed patients to the inherent harms and safety risks of breathing through machines with potentially toxic foam.

237.    By reason of the RICO Defendants' unlawful conduct, Plaintiffs and the Nationwide Class members seek actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1961, *et seq*.

**COUNT II**
**VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(D), AGAINST PHILIPS AND POLYTECH**
**On behalf of the Nationwide Class and all Subclasses[148]**

238.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 237 as if fully set forth here.

239.    This claim is brought by Plaintiffs and the Class against the Rico Defendants for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1961, *et seq*.

240.    Plaintiffs are each a "person," as that term is defined in 18 U.S.C. § 1961(3) and have standing to sue under 18 U.S.C. § 1964(c) because they were (and are) injured in their business and/or property "by reason of" the RICO Act violations set forth herein.

---

[148] Plaintiffs will submit a RICO case statement pursuant to Local R. Civ. P. 7.1.B within 14 days.

241.    It is unlawful "for any person to conspire to violate" 18 U.S.C. § 1962(c). *See* 18 U.S.C. § 1962(d). A defendant who "agreed to facilitate a scheme" violates section 1962(d) even if he "does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense." *Salinas v. United States*, 522 U.S. 52, 65-66 (1997).

242.    The RICO Defendants committed the unlawful acts alleged herein in furtherance of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the RICO Defendants agreed to facilitate the operation of the Enterprise through a pattern of racketeering in violation of 18 U.S.C. § 1962(c). The object of their conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs of the Enterprise (as alleged in Count I) through a pattern of racketeering activity. The RICO Defendants conspired to manufacture, sell, and profit from the Recalled Devices while concealing their health and safety risks. Their conspiracy is coterminous with the time period in which the Enterprise has existed, beginning in or about 2015 and continuing to this day.

243.    The words, actions, or interdependence of each RICO Defendant's acts support the inference that their unlawful agreement existed. Put another way, the RICO Defendants' agreement is evidenced by their predicate acts and direct participation in the control and operation of the Enterprise, as alleged in Count I, regarding the RICO Defendants' substantive violations of Section 1962(c).

244.    The RICO Defendants' acts in furtherance of the conspiracy include each of the predicate acts that constituted the pattern of racketeering underlying their violations of Section 1962(c), as alleged above. Various other persons, firms, and corporations, including third parties and individuals not named as Defendants herein, have participated as co-conspirators with the members of the RICO Defendants' Enterprise in these offenses and furthered the conspiracy to

conceal the health and safety risks in the Recalled Devices to increase or maintain revenue from their unlawful sale.

245.    The success of the RICO Defendants' Enterprise's fraudulent scheme depended on the RICO Defendants' cooperation and agreement. They had to maintain strict confidentiality about the health and safety risks in the Recalled Devices for the scheme to continue. Even after learning of the health and safety risks associated with the PE-PUR foam used in the Recalled Devices, PolyTech continued to obtain the foam from Burnett and prepare it for use in the Recalled Devices. PolyTech knew that Philips would manufacture and sell the Recalled Devices to Plaintiffs and the Nationwide Class without disclosing those risks. Likewise, Philips, with knowledge of the Defect, continued to place orders that would cause PolyTech to obtain and ship PE-PUR foam for use in the Recalled Devices.

246.    Philips depended on PolyTech for the sourcing, cutting, and acquisition of the PE-PUR foam for the Recalled Devices, and for coordinating with Burnett to do so. On the other hand, PolyTech depended upon Philips for a viable path to profit from sale of the Recalled Devices. This interdependence also evidences their agreement to further the fraudulent scheme.

247.    Where a RICO Defendant did not commit a predicate act itself, it is legally sufficient that it was aware of the essential nature and scope of the RICO Defendants' Enterprise, such that it agreed to the commission of foreseeable predicate acts to advance the Enterprise's goals. The acts alleged above and throughout this Complaint by each member of the RICO Defendants' Enterprise were foreseeable to the other members of the enterprise given their direct relationship to and furtherance of the common goals of the scheme.

248.    The RICO Defendants each violated 18 U.S.C. § 1962(d) and injured the business or property of Plaintiffs and the Nationwide Class. The RICO Defendants' violations of 18 U.S.C.

§ 1962(d) caused the same injuries and damages alleged in Count I. This Count incorporates by reference Count I's allegations regarding injury, damages, and causation. Plaintiffs seek damages for themselves and the Nationwide Class members under 18 U.S.C. § 1964(c).

### COUNT III
### BREACH OF EXPRESS WARRANTY
### On behalf of the Nationwide Class and all Subclasses

249.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 182 as if fully set forth here.

250.    Philips warranted that all of the Recalled Devices "shall be free from defects of workmanship and materials and will perform in accordance with the product specifications for a period of two (2) years from the date of sale."[149]

251.    Philips breached this express warranty in connection with the sale and distribution of the Recalled Devices. At the point of sale, the Recalled Devices, while appearing normal, contained latent defects as set forth herein, rendering them unsuitable and unsafe for personal use.

252.    If Plaintiffs and the Class had known the Recalled Devices were defective and unsafe for use, they would not have paid for them.

253.    Despite the risks of using the Recalled Devices, Philips has breached its warranty and refused to provide appropriate warranty relief. Plaintiffs and the Class reasonably expected, at the time of purchase, that the Recalled Devices were safe for their ordinary and intended use.

254.    To the extent privity could be required, Plaintiffs and the Class can demonstrate privity with Philips, or alternatively, can demonstrate that they satisfy applicable exceptions to any privity requirement.

---

[149] *See, e.g.,* Warranty Exemplars: Dreamstation (attached hereto as Exhibit "J-1"), at 29; REMstar SE (attached hereto as Exhibit "J-2"), at 21; Trilogy 100 (attached hereto as Exhibit "J-3"), at 163.

255.    Plaintiffs and the Class reasonably relied on Philips' warranties in paying for the Recalled Devices and, it was foreseeable that Plaintiffs and the Class would pay for a large part of the Recalled Devices.

256.    Plaintiffs were not required to give notice to Philips, a remote manufacturer, and Philips has had notice of the type and source of claims in this matter for nearly a year.

257.    Philips has refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Devices. Plaintiffs and the Class reasonably expected, at the time of purchase, that the Recalled Devices were safe for their ordinary and intended use.

258.    As a direct and proximate result of Philips' breach of its express warranty, Plaintiffs and the Class have sustained damages in an amount to be determined at trial.

## COUNT IV
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### On behalf of the Nationwide Class and all Subclasses

259.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 182 as if fully set forth here.

260.    By operation of law, Philips, as the manufacturer of the Recalled Devices and as the provider of a limited warranty for the Recalled Devices, impliedly warranted to Plaintiffs and the Class that the Recalled Devices were of merchantable quality and were both fit and safe for their ordinary and intended use.

261.    The implied warranty of merchantability, contained in U.C.C. § 2-314, has been codified in each state. *See, e.g.*, Cal. Com. Code §§ 2314, *et seq*.; Conn. Gen. Stat. Ann. §§ 42a-2-314, *et seq*.; Fla. Stat. Ann. §§ 672.314, *et seq*.; 810 Ill. Comp. Stat. Ann. 5/2-313; Mass. Gen. Laws Ann. Ch. 106, §§ 2-314, *et seq*.; Mich. Comp. Laws Ann. §§ 440.2314, *et seq*.;; N.Y. U.C.C.

Law §§ 2-314, *et seq*.; Ohio Rev. Code Ann. §§ 1302.27, *et seq*.; R.I. Gen. Laws §§ 6A-2-314, *et seq*.; and Wis. Stat. Ann. § 402.313.

262.     Philips breached the implied warranty of merchantability in connection with the sale and distribution of the Recalled Devices. At the point of sale, the Recalled Devices, while appearing normal, contained the latent defects alleged herein, which rendered them unsuitable and unsafe for personal use.

263.     If Plaintiffs and the Class had known the Recalled Devices were unsafe for use, they would not have paid for them or provided reimbursements for their purchase.

264.     To the extent privity could be required, Plaintiffs and the Class can demonstrate privity with Philips, or alternatively can demonstrate that they satisfy applicable exceptions to any privity requirement.

265.     Plaintiffs and the Class reasonably relied on Philips' warranties in paying for the Recalled Devices and, it was foreseeable that Plaintiffs and the Class would pay for a large part of the Recalled Devices.

266.     Plaintiffs were not required to give notice to Philips, a remote manufacturer, and Philips has had notice of the type and source of claims in this matter for nearly a year.

267.     Philips has refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Devices. Plaintiffs and the Class reasonably expected, at the time of purchase, that the Recalled Devices were safe for their ordinary and intended use.

268.     As a direct and proximate result of Philips' breach of the implied warranty of merchantability, Plaintiffs and the Class have sustained damages in an amount to be determined at trial.

**COUNT V**
**BREACH OF THE IMPLIED WARRANTY OF USABILITY**
**On behalf of the Nationwide Class and all Subclasses**

269.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 182 as if fully set forth here.

270.    By operation of law, Philips, as the manufacturer of the Recalled Devices and as the providers of a limited warranty for the Recalled Devices, impliedly warranted to Plaintiffs and the Class that the Recalled Devices were usable for their ordinary and intended use.

271.    Such implied warranty arises under U.C.C. § 2-314(3) as adopted in each state.

272.    Such implied warranty of usability, contained in U.C.C. § 2-314(3), has been codified in each state. *See, e.g.*, Cal. Com. Code §§ 2314, *et seq.*; Conn. Gen. Stat. Ann. §§ 42a-2-314, *et seq.*; Fla. Stat. Ann. §§ 672.314, *et seq.*; 810 Ill. Comp. Stat. Ann. 5/2-313; Mass. Gen. Laws Ann. Ch. 106, §§ 2-314, *et seq.*; Mich. Comp. Laws Ann. §§ 440.2314, *et seq.*; N.Y. U.C.C. Law §§ 2-314, *et seq.*; Ohio Rev. Code Ann. §§ 1302.27, *et seq.*; R.I. Gen. Laws §§ 6A-2-314, *et seq.*; and Wis. Stat. Ann. § 402.313.

273.    Through usage of trade, manufacturers of prescription drugs and medical devices impliedly warrant that their products are usable for the end consumer.

274.    Philips breached the implied warranty of usability in connection with the sale and distribution of the Recalled Devices. At the point of sale, the Recalled Devices while appearing normal—contained defects as set forth herein rendering them unusable.

275.    Philips, its agents and employees, knew or should have known that the Recalled Devices suffer from a defect that causes negative health effects or places persons at risk for negative health effects to such an extent that the products are unusable.

276.    Philips' Recall announcement instructed Class members to not use Recalled Devices because of the health risks. This renders the products unusable and thus worthless.

277.    Philips has refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Devices. Plaintiffs and the Class reasonably expected, at the time of purchase, that the Recalled Devices were usable for their ordinary and intended use.

278.    To the extent privity could be required, Plaintiffs and the Class can demonstrate privity with Philips, or alternatively can demonstrate that they satisfy applicable exceptions to any privity requirement.

279.    Plaintiffs and the Class reasonably relied on Philips' warranties in paying for the Recalled Devices and, it was foreseeable that Plaintiffs and the Class would pay for a large part of the Recalled Devices.

280.    Plaintiffs were not required to give notice to Philips, and Philips has had notice of the type and source of claims in this matter for nearly a year. If Plaintiffs and Class members had known they would not be able to use the Recalled Devices, they would not have paid for them or would have paid far less for them.

281.    As a direct and proximate result of Philips' breach of the implied warranty of usability, Plaintiffs and the Class have sustained damages in an amount to be determined at trial.

**COUNT VI**
**VIOLATIONS OF MAGNUSON-MOSS FEDERAL WARRANTY ACT**
**15 U.S.C. 2301, *et seq.***
**On behalf of the Nationwide Class and all Subclasses**

282.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 182 as if fully set forth here.

283.    The Recalled Devices constitute "consumer products" as defined in 15 U.S.C. § 2301.

284.    Plaintiffs and the members of the Class are "consumers" as defined in 15 U.S.C. § 2301.

285.    Philips is a "supplier" of the Recalled Devices as defined in 15 U.S.C. § 2301.

286.    Philips is a "warrantor" as defined in 15 U.S.C. § 2301.

287.    The warranties made by Philips pertained to consumer products costing the consumer more than five dollars, *see* 15 U.S.C. § 2302(e).

288.    Plaintiffs and the members of the Class invoke federal jurisdiction for the claims stated in this Count pursuant to the Class Action Fairness Act.

289.    The Recalled Devices were defective when they came off Philips' assembly lines and at all subsequent times (including when they were sold or delivered to Plaintiffs and Class members), because their defective foam and design make them dangerously unsafe.

290.    As a result, the Recalled Devices were worthless, or were worth far less than the prices paid for them, at the time of sale, if they were worth anything at all.

291.    Plaintiffs and the members of the Class would not have purchased or accepted the Recalled Devices if had they known the machines were dangerously defective.

292.    Philips violated the Magnuson-Moss Federal Warranty Act by breaching the express warranties it made to Plaintiffs and Class members.

293.    Plaintiffs and the Class members had no duty to give Philips notice of the defects or an opportunity for Philips to cure its breach of warranties prior to filing this action and may give such notice to Philips on their own behalf and on behalf of the Class after class certification, pursuant to 15 U.S.C. § 2310(e).

294.    Based on the facts alleged here, any durational limits to the warranties that might otherwise bar the Magnuson-Moss claims in this Count are procedurally and substantively

unconscionable and otherwise unenforceable under both federal law and applicable state law.

295.    Based on the facts alleged here, any durational limits to the warranties that might otherwise bar the claims in this Count also are tolled under equitable doctrines.

296.    Plaintiffs and the members of the Class sustained injuries and damages as a proximate result of Philips' violation of its express and implied warranties, and are entitled to legal and equitable relief against Philips, including economic damages, rescission or other relief as appropriate, including compensatory damages consisting of: (a) the difference between the values of the Recalled Devices as warranted (the prices paid) and the devices' actual values at the time of purchase (zero), or (b) the cost to replace the Recalled Devices, together with (c) other incidental and consequential damages.

297.    In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other members of the Class are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have been reasonably incurred by them in connection with the commencement and prosecution of this action.

### COUNT VII
### COMMON LAW FRAUD
### On Behalf of the Nationwide Class and all Subclasses

298.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 182 as if fully set forth here.

299.    Philips knew that the Recalled Devices posed serious health risks to users.

300.    Philips failed to advise Plaintiffs and the Class of the material fact that the Recalled Devices posed serious health risks to users. Philips concealed from Plaintiffs and Class members this material information regarding the serious health risks posed by the Recalled Devices. Further,

Philips affirmatively misrepresented to Plaintiffs and the Class members that the Recalled Devices were safe to use.

301.    Philips had a duty to disclose to Plaintiffs and Class members the Recalled Devices' serious health risks, because: (a) Philips was in a superior position to Plaintiffs and Class members to know the risks of using the Recalled Devices; (b) Philips was in a superior bargaining position to Plaintiffs and the Class members in determining whether to disclose or conceal information regarding the Recalled Devices in its packaging, labels, advertising, and websites; (c) Philips made representations regarding the safety of the Recalled Devices, and had a duty to fully disclose all material facts regarding the serious health risks to users posed by the Recalled Devices as soon as Philips became aware of those risks; (d) Philips knew that Plaintiffs and Class members could not reasonably have been expected to learn or discover the serious health risks posed by use of the Recalled Devices before paying for them, because of Philips' material misrepresentations and omissions in its packaging, labels, advertising, and websites; and (e) because Philips has a duty to disclose information regarding the health and safety of its products.

302.    Philips intentionally, knowingly, or recklessly allowed its packaging, labels, advertisements, promotional materials, and websites to mislead Plaintiffs and the Class members into believing that the Recalled Devices were safe for use.

303.    Philips knew or recklessly disregarded the fact that its representations, omissions and concealment of material facts regarding the Recalled Devices in its packaging, labels, advertisements, promotional materials, and websites were false, deceptive, inadequate, and misleading, and that the Recalled Devices contained PE-PUR Foam which posed a serious risk of causing adverse health effects to anyone who used them.

304.    Philips misrepresented, omitted and concealed material information from Plaintiffs and Class members regarding the serious health risks posed to users of the Recalled Devices, by failing to disclose that information in its packaging, labels, advertisements, promotional materials, and websites.

305.    The information that Philips misrepresented, omitted and concealed from Plaintiffs and Class members was material, because reasonable consumers would regard information about the serious health risks posed by use of the Recalled Devices important in deciding whether to purchase them.

306.    As a result of Philips' deceptive packaging, labels, advertisements, promotional materials, and websites, Plaintiffs and Class members justifiably and reasonably believed that the Recalled Devices were safe for use.

307.    Philips intentionally, knowingly, or recklessly made these material omissions and misrepresentations, and concealed material information regarding the adverse health risks of using the Recalled Devices in its packaging, labels, advertisements, promotional materials, and websites, with the intent to induce Plaintiffs and Class members to purchase or pay for the Recalled Devices.

308.    Plaintiffs and Class members reasonably relied to their detriment on Philips' deceptive packaging, labels, advertisements, promotional materials, and websites, in purchasing, paying for, and using the Recalled Devices. That reliance was justified and reasonable because of the deceptive manner in which Philips advertised, represented, and promoted the Recalled Devices.

309.    As a proximate result of Philips' material omissions, misrepresentations, and concealment of material information regarding the adverse health risks to users of the Recalled Devices, Plaintiffs and Class members have suffered actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definite, objective evidence. Those damages are

(a) the difference between the values of the Recalled Devices as represented (the prices paid) and their actual values at the time of purchase (zero), or (b) the cost to replace the Recalled Devices, and (c) together with consequential and incidental damages.

## COUNT VIII
## UNJUST ENRICHMENT (in the alternative)
## On behalf of the Nationwide Class and all Subclasses

310.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 182 as if fully set forth here.

311.    Plaintiffs and Class members conferred on Philips a tangible and material economic benefit by purchasing and paying for the Recalled Devices. Plaintiffs and Class members would not have purchased or paid for the Recalled Devices if they had known the serious health risks posed by using the Recalled Devices.

312.    Philips readily accepted and retained these economic benefits. Philips profited from the sale of the Recalled Devices to the economic detriment and injury of Plaintiffs and Class members.

313.    Philips sought these economic benefits, which were the unjust result of Philips' acting in its pecuniary interest at the expense of its customers. At all relevant times, Philips knew, had reason to know, or should have known that the Recalled Devices were defective, but failed to disclose this information, thereby misleading Plaintiffs and Class members, while being unjustly enriched by Plaintiffs' and Class members purchases or payments for the Recalled Devices.

314.    In these circumstances, it would be unjust, unfair and inequitable for Philips to retain the economic benefits it improperly received from Plaintiffs and Class members, which were obtained through unlawful conduct, including misrepresentation, omission, and concealment of material facts. Allowing Philips to retain those economic benefits and not disgorge them would

reward Philips for its wrongful conduct and unjustly enrich Philips at the expense of Plaintiffs and Class members.

315.    Philips' retention of the benefits conferred on it by Plaintiffs and the Class would be unjust and inequitable.

316.    Plaintiffs have a right to disgorgement and restitution of the economic benefits Philips unjustly obtained and retained, in amounts necessary to return Plaintiffs to the position they were in prior to dealing with Philips, to be determined at trial.

317.    Plaintiffs bring this claim separately from, and in the alternative to, their other claims, because without such claims they would have no adequate legal remedy.

318.    Plaintiffs and the Class suffered damages in an amount to be determined at trial.

<u>COUNT IX</u>
**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*. (Unfair and Fraudulent Conduct)**
**On Behalf of the California Subclass, except for Class**
**<u>Members who purchased or paid for a Recalled Device for business use only</u>**

319.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 182 as if fully set forth here. Plaintiffs bring this claim individually and on behalf of the members of the California Subclass.

320.    Plaintiffs are consumers under the UCL.

321.    California Business & Professions Code § 17200 ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

322.    Philips' acts and practices alleged herein constitute "unfair" business acts and practices under the UCL because Philips' conduct is and was unconscionable, immoral, deceptive,

unfair, illegal, unethical, oppressive and unscrupulous. Further, the gravity of Philips' misconduct outweighs any permissible benefit from that conduct.

323.    Philips has, in the course of its business and in the course of trade or commerce, undertaken and engaged in unfair business acts and practices under the UCL by failing to disclose and concealing the true risks of the Recalled Devices.

324.    These acts also constitute "fraudulent" business acts and practices under the UCL because Philips' conduct was and is false, misleading, and has a tendency to deceive California Subclass members and the general public.

325.    Plaintiffs and California Subclass members have suffered injury in fact and economic losses as a result of Philips' fraudulent business acts or practices.

326.    The above-described unfair and fraudulent business acts or practices present a threat and likelihood of harm and deception to Plaintiffs and California Subclass members.

327.    Pursuant to Business and Professions Code §§ 17200 and 17203, Plaintiffs and California Subclass members seek an order requiring disgorgement and restitution of all profits obtained through the above-described unfair and fraudulent business acts or practices, together with such injunctive and declaratory relief as may be appropriate.

328.    Because of their reliance on Philips' omissions concerning the Recalled Devices, Plaintiffs and California Subclass members suffered an ascertainable loss of money, property, and/or value and were harmed and suffered actual damages.

329.    Plaintiffs and California Subclass members are reasonable consumers who did not expect the risks inherent with the Recalled Devices.

330.     Philips' conduct in misrepresenting, failing to disclose, and concealing the true risks of the Recalled Devices violated the UCL because it is fraudulent, immoral, unethical, unscrupulous, oppressive, and substantially injurious.

331.     The gravity of harm resulting from Philips' improper conduct outweighs any potential utility. The practice of selling Recalled Devices that present a substantial health risk to consumers harms the public at large and furthered a common and uniform course of wrongful conduct.

332.     The harm from Philips' conduct was not reasonably avoidable by purchasers and payors (such as TPPs), because only ~~Defendants~~ were aware of the true facts concerning the risks of the Recalled Devices, which Philips misrepresented, failed to disclose, and concealed. Plaintiffs and California Subclass members did not know of and had no reasonable means of discovering the true risk posed by use of the Recalled Devices.

333.     Plaintiffs and California Subclass members suffered injury in fact, including lost money or property, as a result of Philips' unfair and fraudulent conduct. But for Philips' unfair conduct, Plaintiffs and California Subclass members would not have bought or paid for the Recalled Devices.

334.     Through its unfair and fraudulent conduct, Philips obtained money belonging to Plaintiffs and California Subclass members.

335.     Plaintiffs and California Subclass members seek appropriate relief under the UCL, including (a) restitution in full, and (b) such orders or judgments as may be necessary to enjoin Philips from continuing its unfair and fraudulent practices.

**COUNT X**
**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code §§ 17200,** *et seq.* **(Unlawful Conduct)**
**On Behalf of the California Subclass, except for Class**
**Members who purchased or paid for a Recalled Device for business use only**

336.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 182 as if fully set forth here. Plaintiffs bring this claim individually and on behalf of the members of the California Subclass.

337.    Plaintiffs are consumers under the UCL.

338.    The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200 ("UCL"). By engaging in business practices which also are unlawful, Philips violated the UCL.

339.    Philips' unlawful acts and practices include its RICO violations, breach of express warranty, breaches of the implied warranties of merchantability and usability, violations of the Magnuson-Moss Federal Warranty Act, fraud, and unjust enrichment.

340.    Philips breached applicable warranties in connection with the sale and distribution of the Recalled Devices. Philips sold the Recalled Devices to Plaintiffs and the California Subclass members, knowing they were defective and posed serious health risks. Philips further refused to provide appropriate warranty relief in connection with the Recalled Devices, despite knowing that those medical devices were vital to Plaintiffs' and California Subclass members' beneficiaries' health.

341.    Plaintiffs and California Subclass members conferred tangible and material economic benefits on Philips by purchasing and paying for the Recalled Devices. Plaintiffs and California Subclass members would not have purchased or paid for their Enrollees' Recalled

Devices if they had known of the serious health risks posed by the devices, or that Philips would refuse to appropriately repair or replace them.

342.    Plaintiffs and California Subclass members have a legal interest in their ability to provide medical devices that can safely be used and to have the Recalled Devices appropriately repaired or replaced. Philips' actions violated these interests and rights.

343.    Philips reaped unjust profits, revenue, and benefits because of its UCL violations. Plaintiffs and California Subclass members have a right to disgorgement and restitution of those unjust and unlawful profits and revenues, in amounts to be proven at trial, together with other appropriate relief.

**COUNT XI**
**VIOLATIONS OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**
**Cal. Civ. Code §1750, *et seq.***
**On Behalf of the California Subclass, except for Class**
**Members who purchased or paid for a Recalled Device for business use only**

344.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 182 as if fully set forth here. Plaintiffs bring this claim individually and on behalf of the members of the California Subclass.

345.    The California Consumers Legal Remedies Act ("CLRA") protects California consumers from deceptive and unfair trade practices.

346.    Plaintiffs are consumers under the CLRA.

347.    Philips' conduct alleged herein constitutes a knowing act, use or employment of deception, false promise, misrepresentation, unfair practice, and concealment, suppression, and omission of material facts in connection with the sale and advertisement of merchandise (the Recalled Devices), in trade or commerce in California, which Philips committed with knowledge of the serious health risks associated with use of the Recalled Devices and with the intention that

Plaintiffs and California Subclass members would rely on its conduct in purchasing or paying for the Recalled Devices. That conduct violates Cal. Civ. Code §1750, *et seq.*

348.    Plaintiffs and California Subclass members relied on Philips' material representations, paid for or reimbursed payment of the Recalled Devices for their beneficiaries personal purposes, and suffered ascertainable losses of money or property as the result of Philips' use or employment of a method, act or practice declared unlawful by Cal. Civ. Code §1750, *et seq.* Plaintiffs and California Subclass members acted as reasonable consumers in the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing or paying for the Recalled Devices), which that resulted in damages.

349.    Accordingly, pursuant to Cal. Civ. Code §1750, *et seq.*, Plaintiffs and California Subclass members have a right to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definite and objective evidence. Those damages are (a) the difference between the values of the Recalled Devices as represented (the prices paid) and their actual values at the time of purchase (zero), or (b) the cost to replace the Recalled Devices, and (c) other consequential and incidental. Further, because of the nature of Philips' conduct, Plaintiffs and California Subclass members have a right to recover statutory, exemplary, trebled or punitive damages and attorneys' fees based on the amount of time reasonably expended, together with such equitable relief as is necessary or proper to protect them from Philips' unlawful conduct.

350.    To the extent that any pre-suit notice might have been required, Philips has had actual notice of its unlawful conduct since the 2021 Recall, at the very latest. It was also put on notice by an September 8, 2021 letter notifying Philips of related claims. Further, on May 16, 2022,

Philips was sent an additional letter that satisfied any purported pre-suit notification requirement. Philips has failed to remedy its unlawful conduct.

**COUNT XII**
**VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW**
**Cal. Bus. & Prof. Code § 17500, *et seq.***
**On Behalf of the California Subclass, except for Class**
**Members who purchased or paid for a Recalled Device for business use only**

351.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 182 as if fully set forth here. Plaintiffs bring this claim individually and on behalf of the members of the California Subclass.

352.    The California False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, was enacted to protect California consumers from deceptive and unfair business practices.

353.    Plaintiffs are consumers under the FAL.

354.    Philips' conduct alleged herein constitutes the knowing act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of merchandise, the Recalled Devices, in trade or commerce in California, making it unlawful under Cal. Bus. & Prof. Code § 17500, *et seq*.

355.    Plaintiffs and California Subclass members purchased or paid for the Recalled Devices for their beneficiaries' personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Cal. Bus. & Prof. Code § 17500, *et seq*. Plaintiffs and California Subclass members acted as reasonable consumers would have acted under the circumstances, because Philips' unlawful conduct would (and did) cause reasonable persons to enter into transactions (purchasing or paying for the Recalled Devices) that resulted in the damages.

356.     Accordingly, pursuant to Cal. Bus. & Prof. Code § 17500, *et seq*., Plaintiffs and California Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definite and objective evidence. Those damages are (a) the difference between the values of the Recalled Devices as represented (the prices paid) and their actual values at the time of purchase (zero), or (b) the cost to replace the Recalled Devices, and (c) other consequential and incidental damages. In addition, because of the nature of Philips' conduct, Plaintiffs and California Subclass members have a right to all available statutory, exemplary, treble or punitive damages, as well as attorneys' fees based on the amount of time reasonably expended, together with such equitable relief as is necessary or proper to protect them from Philips' unlawful conduct.

### COUNT XIII
### VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT
### Conn. Gen. Stat. § 42-110a to -110q, *et seq*.
### On Behalf of the Connecticut Subclass, except for Class
### Members who purchased or paid for a Recalled Device for business use only

357.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 182 as if fully set forth here. Plaintiffs bring this claim individually and on behalf of Connecticut Subclass members.

358.     The Connecticut Unfair Trade Practices Act ("CUPTA"), Conn. Gen. Stat. §42-110a, *et seq,* was enacted to protect Connecticut consumers from deceptive and unfair business practices.

359.     Plaintiffs are consumers under the CUPTA.

360.     Philips' conduct described herein constitutes the knowing act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of merchandise, the

Recalled Devices, in trade or commerce in Connecticut, making it unlawful under Conn. Gen. Stat. §42-110a, *et seq*.

361.    Plaintiffs and Connecticut Subclass members purchased or paid for the Recalled Devices for their beneficiaries' personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Conn. Gen. Stat. §42-110a, *et seq*. Plaintiffs and Connecticut Subclass members acted as reasonable consumers would have acted under the circumstances, because Philips' unlawful conduct would (and did) cause reasonable persons to enter into the transactions (paying for or reimbursing payment of the Recalled Devices) that resulted in the damages.

362.    Accordingly, pursuant to Conn. Gen. Stat. §42-110a, *et seq*., Plaintiffs and Connecticut Subclass members have a right to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definite and objective evidence. Those damages are (a) the difference between the values of the Recalled Devices as represented (the prices paid) and their actual values at the time of purchase (zero), or (b) the cost to replace the Recalled Devices, and (c) other consequential and incidental damages. Further, because of the nature of Philips' conduct, Plaintiffs and Connecticut Subclass members have a right to all available statutory, exemplary, treble or punitive damages, as well as attorneys' fees based on the amount of time reasonably expended, together with such equitable relief as is necessary or proper to protect them from Philips' unlawful conduct.

<u>COUNT XIV</u>
**VIOLATIONS OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**Fla. Stat. § 501.201 *et seq.***
**On Behalf of the Florida Subclass, except for Class**
**<u>Members who purchased or paid for a Recalled Device for business use only</u>**

363.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 182 as if fully set forth here. Plaintiffs bring this claim individually and on behalf of the members of the Florida Subclass.

364.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") Fla. Stat. § 501.201 *et seq*, was enacted to protect Florida consumers from deceptive and unfair business practices.

365.    Plaintiffs are consumers as defined by FDUTPA.

366.    Philips' conduct alleged herein constitutes the use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of merchandise (the Recalled Devices), in trade or commerce in Florida, which is unlawful under Fla. Stat. § 501.201 *et seq.*

367.    Plaintiffs and Florida Subclass members relied on Philips' material misrepresentations, omissions, and concealment of material facts, and purchased or paid for the Recalled Devices for their beneficiaries' personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Fla. Stat. Ann. § 501.201, *et seq.* Plaintiffs and Florida Subclass members acted as reasonable consumers would have acted under the circumstances, because Philips' unlawful conduct would (and did) cause reasonable persons to enter into the transactions (paying for or reimbursing payment of the Recalled Devices) that resulted in the damages.

368.    Accordingly, pursuant to Fla. Stat. Ann. § 501.201 *et seq.*, Plaintiffs and Florida Subclass members have a right to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definite and objective evidence. Those damages are (a) the difference between the values of the Recalled Devices as represented (the prices paid) and their actual values at the time of purchase (zero), or (b) the cost to replace the Recalled Devices, and (c) consequential and incidental damages. Further, because of the nature of Philips' conduct, Plaintiffs and Florida Subclass members have a right to recover all available statutory, exemplary, treble or punitive damages, as well as attorneys' fees based on the amount of time reasonably expended, together with such equitable relief as is necessary or proper to protect them from Philips' unlawful conduct.

## COUNT XV
### VIOLATIONS OF THE FLORIDA FALSE ADVERTISING STATUTE
### Fla. Stat. §§ 817.06, 817.41 *et seq.*
### On Behalf of the Florida Subclass, except for Class
### Members who purchased or paid for a Recalled Device for business use only

369.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 182 as if fully set forth here. Plaintiffs bring this claim individually and on behalf of the members of the Florida Subclass.

370.    The Florida False Advertising Statute, Fla. Stat. § 817.06 and § 817.41, *et seq.*, was enacted to protect Florida consumers from deceptive and unfair advertising practices.

371.    Plaintiffs are consumers as defined by the Florida False Advertising Statute.

372.    Philips' conduct alleged herein constitutes the use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression and omission of material facts in connection with the advertisement of merchandise (the Recalled Devices) in trade or commerce in Florida, and was made with the intent that Plaintiffs and Florida Subclass

members rely on such advertisements in purchasing or paying for the Recalled Devices, making it unlawful under Fla. Stat. § 817.06 and § 817.41, *et seq.*

373.    Plaintiffs and Florida Subclass members relied on Philips' material misrepresentations, purchased the Recalled Devices for their beneficiaries' personal purposes and suffered ascertainable losses of money or property as the result of Philips' use or employment of a method, act or practice declared unlawful by Fla. Stat. § 817.06 and § 817.41, *et seq.* Plaintiffs and Florida Subclass members acted as reasonable consumers would have acted in the circumstances, because Philips' unlawful conduct would (and did) cause reasonable persons to enter into the transactions (paying for or reimbursing payment of Recalled Devices) that resulted in the damages.

374.    Accordingly, under Fla. Stat. § 817.06 and §817.41, *et seq.*, Plaintiffs and Florida Subclass members have a right recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definite and objective evidence. Those damages are (a) the difference between the values of the Recalled Devices as represented (the prices paid) and their actual values at the time of purchase (zero), or (b) the cost to replace the Recalled Devices, and (c) other consequential and incidental damages. Further, because of Philips' conduct, Plaintiffs and Florida Subclass members have a right to recover all available statutory, exemplary, treble or punitive damages, as well as attorneys' fees based on the amount of time reasonably expended, together with such equitable relief as is necessary or proper to protect them from Philips' unlawful conduct.

**COUNT XVI**
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE**
**PRACTICES ACT**
**815 ILCS 505/1, *et seq.***
**On Behalf of the Illinois Subclass, except for Class**
**Members who purchased or paid for a Recalled Device for business use only**

375.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 182 as if fully set forth here. Plaintiffs bring this claim individually and on behalf of the members of the Illinois Subclass.

376.    The Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1, *et seq.*, was enacted to protect Illinois consumers from unfair or deceptive business practices.

377.    Plaintiffs are consumers under the Illinois Consumer Fraud and Deceptive Practices Act.

378.    Philips intentionally engaged in deceptive and unfair acts or practices, false promises and misleading and unconscionable commercial practices, including misleading omissions of material fact, in connection with the advertisement, marketing, promotion and sale of the Recalled Devices, misrepresenting their safety and failing to disclose the dangers caused by the PE-PUR foam degradation.

379.    Plaintiffs and Illinois Subclass members purchased or paid for the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by 815 ILCS 505/2. Plaintiffs and Illinois Subclass members acted as reasonable consumers would have acted in the circumstances, because Philips' unlawful conduct would (and did) cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

380.    Accordingly, pursuant to the aforementioned statutes, Plaintiffs and Illinois Subclass members have a right to recover their actual damages, which can be calculated with a

reasonable degree of certainty using sufficiently definite and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (the prices paid) and their actual values at the time of purchase (zero), or (b) the cost to replace the Recalled Devices, and (c) other consequential and incidental damages. In addition, Plaintiffs and Illinois Subclass members have a right to recover the costs of suit and attorneys' fees based on the amount of time reasonably expended, such equitable relief as is necessary, and such other relief as the Court deems proper.

**COUNT XVII**
**VIOLATIONS OF THE MASSACHUSETTS REGULATION OF BUSINESS PRACTICES FOR CONSUMERS**
**Mass. Gen. L. Ch. 93A §1-11, *et seq.***
**On Behalf of the Massachusetts Subclass, except for Class**
**Members who purchased or paid for a Recalled Device for business use only**

381.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 182 as if fully set forth here. Plaintiffs bring this claim individually and on behalf of the members of the Massachusetts Subclass.

382.    The Massachusetts Regulation of Business Practices for Consumers Act was enacted to protect Massachusetts consumers from deceptive and unfair business practices.

383.    Plaintiffs are consumers as defined by the Massachusetts Regulation of Business Practices for Consumers Act.

384.    Philips' conduct alleged herein constitutes the knowing and intentional act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of merchandise (the Recalled Devices), in trade or commerce in Massachusetts, making it unlawful under Mass. Gen. L. Ch. 93A §1-11, *et seq.*

385.    Plaintiffs and Massachusetts Subclass members relied on the material representations made by Philips and purchased the Recalled Devices for their beneficiaries personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Mass. Gen. L. Ch. 93A §1-11, *et seq.* Plaintiffs and Massachusetts Subclass members acted as reasonable consumers would have acted in the circumstances, because Philips' unlawful conduct would (and did) cause reasonable persons to enter into the transactions (purchasing or paying for the Recalled Devices) that resulted in the damages.

386.    Accordingly, pursuant to Mass. Gen. L. Ch. 93A §1-11, *et seq.*, Plaintiffs and Massachusetts Subclass members have a right to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definite and objective evidence. Those damages are (a) the difference between the values of the Recalled Devices as represented (the prices paid) and their actual values at the time of purchase (zero), or (b) the cost to replace the Recalled Devices, and (c) other consequential or incidental. Further, because of the nature of Philips' conduct, Plaintiffs and Massachusetts Subclass members have a right to all available statutory, exemplary, treble, or punitive damages, as well as attorneys' fees based on the amount of time reasonably expended, together with such equitable relief as is necessary or proper to protect them from Philips' unlawful conduct.

387.    To the extent that any pre-suit notice might have been required, Philips has had actual notice of its unlawful conduct since the 2021 Recall, at the very latest. It was also put on notice by an September 8, 2021 letter notifying Philips of related claims. Further, on May 16, 2022, Philips was sent an additional letter that satisfied any purported pre-suit notification requirement. Philips has failed to remedy its unlawful conduct.

**COUNT XVIII**
**VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT**
**Mich. Stat. § 445.901, *et seq.***
**On Behalf of the Michigan Subclass, except for Class**
**Members who purchased or paid for a Recalled Device for business use only**

388.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 182 as if fully set forth here. Plaintiffs bring this claim individually and on behalf of the members of the Michigan Subclass.

389.    The Michigan Consumer Protection Act, Mich. Stat. § 445.901, *et seq.*, was enacted to protect Michigan consumers from unfair or deceptive business practices.

390.    Plaintiffs are consumers under the Michigan Consumer Protection Act.

391.    Philips intentionally engaged in deceptive and unfair acts or practices, false promises and misleading and unconscionable commercial practices, including misleading omissions of material fact, in connection with the advertisement, marketing, promotion and sale of the Recalled Devices, misrepresenting their safety and failing to disclose the dangers caused by the PE-PUR foam degradation.

392.    Plaintiffs and Michigan Subclass members purchased or paid for the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Mich. Stat. § 445.903. Plaintiffs and Michigan Subclass members acted as reasonable consumers would have acted in the circumstances, because Philips' unlawful conduct would (and did) cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

393.    Accordingly, pursuant to the aforementioned statutes, Plaintiffs and Michigan Subclass members have a right to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definite and objective evidence. Those damages

are: (a) the difference between the values of the Recalled Devices as represented (the prices paid) and their actual values at the time of purchase (zero), or (b) the cost to replace the Recalled Devices, and (c) other consequential and incidental damages. In addition, Plaintiffs and Michigan Subclass members have a right to recover the costs of suit and attorneys' fees based on the amount of time reasonably expended, such equitable relief as is necessary, and such other relief as the Court deems proper.

394.    To the extent that any pre-suit notice might have been required, Philips has had actual notice of its unlawful conduct since the 2021 Recall, at the very latest. It was also put on notice by an September 8, 2021 letter notifying Philips of related claims. Further, on May 16, 2022, Philips was sent an additional letter that satisfied any purported pre-suit notification requirement. Philips has failed to remedy its unlawful conduct.

**COUNT XIX**
**VIOLATIONS OF THE NEW YORK DECEPTIVE ACTS OR PRACTICES AND FALSE ADVERTISING**
**N.Y. Gen. Bus. Law §349; §350**
**On Behalf of the New York Subclass, except for Class**
**Members who purchased or paid for a Recalled Device for business use only**

395.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 182 as if fully set forth here. Plaintiffs bring this claim individually and on behalf of the members of the New York Subclass.

396.    The New York General Business Laws were enacted to protect New York consumers from fraudulent business practices and false advertising.

397.    Plaintiffs are consumers under the New York General Business Laws.

398.    Philips unfairly engaged in deceptive, unconscionable, unlawful, unfair, false, fraudulent and misleading commercial practices, including misleading omissions of material fact,

in connection with the marketing, promotion and sale of the Recalled Devices by misrepresenting their safety and failing to disclose the dangers caused by PE-PUR foam degradation.

399.    Plaintiffs and New York Subclass members purchased the Recalled Devices for their beneficiaries' personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by N.Y. Gen. Bus. Law §§349; 350. Such deceptive method, act or practice was material to Plaintiffs and New York Subclass' members' decision to purchase the Recalled Devices, acting as reasonable consumers would have acted in the circumstances, which cause them economic losses and damages.

400.    Accordingly, Plaintiffs and New York Subclass members have a right to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definite and objective evidence. Those damages are (a) the difference between the values of the Recalled Devices as represented (the prices paid) and their actual values at the time of purchase (zero), or (b) the cost to replace the Recalled Devices, and (c) other consequential and incidental damages. In addition, because of the nature of Philips' conduct, Plaintiffs and New York Subclass members have a right to recover statutory, exemplary, and treble or punitive damages, together with interest, costs of suit, and attorneys' fees based on the amount of time reasonably expended, as well as such equitable relief as is necessary and such other relief as the Court deems proper.

401.    To the extent that any pre-suit notice might have been required, Philips has had actual notice of its unlawful conduct since the 2021 Recall, at the very latest. It was also put on notice by an September 8, 2021 letter notifying Philips of related claims. Further, on May 16, 2022,

Philips was sent an additional letter that satisfied any purported pre-suit notification requirement. Philips has failed to remedy its unlawful conduct.

**COUNT XX**
**VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT**
**Ohio Rev. Code §§ 1345.01, *et seq*. ("CSPA")**
**On Behalf of the Ohio Subclass, except for Class**
**Members who purchased or paid for a Recalled Device for business use only**

402.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 182 as if fully set forth here. Plaintiffs bring this claim individually and on behalf of the members of the Ohio Subclass.

403.    The Ohio Consumer Sales Practices Act, Ohio R.C. § 1345.01, *et seq*., was enacted to protect Ohio consumers from unfair or deceptive business practices.

404.    Plaintiffs are consumers under the Ohio Consumer Sales Practices Act.

405.    Philips intentionally engaged in deceptive and unfair acts or practices, false promises and misleading and unconscionable commercial practices, including misleading omissions of material fact, in connection with the advertisement, marketing, promotion and sale of the Recalled Devices, misrepresenting their safety and failing to disclose the dangers caused by the PE-PUR foam degradation.

406.    Plaintiffs and Ohio Subclass members purchased or paid for the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Ohio Rev. Code §§1345.02(A); 1345.03(A). Plaintiffs and Ohio Subclass members acted as reasonable consumers would have acted in the circumstances, because Philips' unlawful conduct would (and did) cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

407.    Accordingly, pursuant to the aforementioned statutes, Plaintiffs and Ohio Subclass members have a right to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definite and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (the prices paid) and their actual values at the time of purchase (zero), or (b) the cost to replace the Recalled Devices, and (c) other consequential and incidental damages. In addition, Plaintiffs and Ohio Subclass members have a right to recover the costs of suit and attorneys' fees based on the amount of time reasonably expended, such equitable relief as is necessary, and such other relief as the Court deems proper.

**COUNT XXI**
**VIOLATIONS OF THE RHODE ISLAND UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION ACT**
**R.I. Gen. Laws §§ 6-13.1-1, *et seq*.**
**On Behalf of the Rhode Island Subclass, except for Class**
**Members who purchased or paid for a Recalled Device for business use only**

408.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 182 as if fully set forth here. Plaintiffs bring this claim individually and on behalf of the members of the Rhode Island Subclass.

409.    The Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws Ann. § 6-13.1-1, *et seq.*, was enacted to protect Rhode Island consumers from unfair and deceptive business practices.

410.    Plaintiffs are consumers under the Rhode Island Unfair Trade Practice and Consumer Protection Act.

411.    Philips has engaged in deceptive, unconscionable, unfair, immoral, unethical, oppressive, unscrupulous and misleading commercial practices, including misrepresentations and misleading omissions of material fact, in connection with the marketing, promotion and sale of the

111

Recalled Devices, misrepresenting their safety and failing to disclose the dangers caused by the PE-PUR foam degradation.

412.    Plaintiffs and Rhode Island Subclass members justifiably and reasonably relied on Philips' unlawful conduct in purchasing the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of Philips' use or employment of a method, act or practice declared unlawful by R.I. Gen. Laws §§ 6-13.1-1, *et seq*. Plaintiffs and the Rhode Island Subclass acted as reasonable consumers would have acted in the circumstances because Philips' unlawful conduct would (and did) cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

413.    Accordingly, pursuant to the aforementioned statutes, Plaintiffs and Rhode Island Subclass members have a right to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definite and objective evidence. Those damages are (a) the difference between the values of the Recalled Devices as represented (the prices paid) and their actual values at the time of purchase (zero), or (b) the cost to replace the Recalled Devices, and (c) other consequential and incidental damages. Further, because of the nature of Philips' conduct, Plaintiffs and Rhode Island Subclass members have a right to recover all available statutory, exemplary, treble or punitive damages, as well as the costs of suit and attorneys' fees based on the amount of time reasonably expended, together with such equitable relief as is necessary, and such other relief as the Court deems proper.

**COUNT XXII**
**VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICE AND CONSUMER**
**PROTECTION ACT**
**Tex. Bus. Comm. Code Ann. §§ 17.41, *et seq.***
**On Behalf of the Texas Subclass, except for Class**
**Members who purchased or paid for a Recalled Device for business use only**

414.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 182 as if fully set forth here. Plaintiffs bring this claim individually and on behalf of the members of the Texas Subclass.

415.    The Texas Deceptive Trade Practices Act ("TDTPA"), Tex. Bus. Comm. Code Ann. § 17.41, *et seq.*, was enacted to protect Texas consumers from deceptive and unfair business practices.

416.    Plaintiffs are consumers under the TDTPA.

417.    Philips' conduct alleged herein violated several provisions of the TDTPA (at Tex. Bus. & Com. Code Ann. § 17.46(b)), including but not limited to misleading, misrepresenting and omitting material information or supplying false information to consumers as to the source, affiliation, certification, characteristics, ingredients, uses, benefits, quantities, standard, or condition of the Recalled Devices.

418.    Plaintiffs and Texas Subclass members purchased or paid for the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of Philips' use or employment of a method, act or practice declared unlawful by Tex. Bus. & Com. Code Ann. § 17.46(b). Plaintiffs and Texas Subclass members acted as reasonable consumers would have acted under the circumstances, because Philips' unlawful conduct would (and did) cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

419.    Accordingly, pursuant to Tex. Bus. & Com. Code Ann. § 17.50(b)(1), (h), Plaintiffs and Texas Subclass members have a right to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definite and objective evidence. Those damages are (a) the difference between the values of the Recalled Devices as represented (the prices paid) and their actual values at the time of purchase (zero), or (b) the cost to replace the Recalled Devices, and (c) other consequential or incidental damages. Further, because of the nature of Philips' conduct, Plaintiffs and Texas Subclass members have a right to recover treble damages for Philips' willful and knowing violation of the TDTPA, together with attorneys' fees based on the amount of time reasonably expended, and such equitable relief as is necessary or proper to protect them from Philips' unlawful conduct.

420.    To the extent that any pre-suit notice might have been required, Philips has had actual notice of its unlawful conduct since the 2021 Recall, at the very latest. It was also put on notice by an September 8, 2021 letter notifying Philips of related claims. Further, on May 16, 2022, Philips was sent an additional letter that satisfied any purported pre-suit notification requirement. Philips has failed to remedy its unlawful conduct.

**COUNT XXIII**
**VIOLATIONS OF THE WISCONSIN DECEPTIVE TRADE PRACTICE ACT**
**Wis. Stat. § 100.18, *et seq*.**
**On Behalf of the Wisconsin Subclass, except for Class**
**Members who purchased or paid for a Recalled Device for business use only**

421.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 182 as if fully set forth here. Plaintiffs bring this claim individually and on behalf of the members of the Wisconsin Subclass.

422.    The Wisconsin Deceptive Trade Practice Act ("WDTPA"), Wis. Stat. § 100.18, *et seq.*, was created to protect Wisconsin consumers from deceptive and unfair business practices.

423.    Plaintiffs are consumers under the WDTPA.

424.    Philips' conduct alleged herein with respect to the Recalled Devices constitutes unfair or deceptive acts or practices, as well as untrue, deceptive or misleading representations in connection with a sale, making it unlawful under Wis. Stat. § 100.18(1).

425.    Plaintiffs and Wisconsin Subclass members purchased or paid for the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of Philips' use or employment of a method, act or practice declared unlawful by Wis. Stat. §§ 100.18(2), 100.18(9)(a). Plaintiffs and Wisconsin Subclass members acted as reasonable consumers would have acted in the circumstances, because Philips' unlawful conduct would (and did) cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

426.    Accordingly, pursuant to Wis. Stat. § 100.18(11)(b)(2), Plaintiffs and Wisconsin Subclass members have a right to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definite and objective evidence. Those damages are (a) the difference between the values of the Recalled Devices as represented (the prices paid) and their actual values at the time of purchase (zero), or (b) the cost to replace the Recalled Devices, and (c) other consequential and incidental damages. Further, because of the nature of Philips' conduct, Plaintiffs and Wisconsin Subclass members have a right to recover attorneys' fees based on the amount of time reasonably expended and such equitable relief as is necessary or proper to protect them from Philips' unlawful conduct.

## VIII.    RELIEF NOT REQUESTED AND RESERVATION OF RIGHTS

427.    None of the claims asserted herein seek damages or other relief for medical monitoring or personal injuries resulting from Plaintiffs' and Class members' beneficiaries' use of the Recalled Devices. Such claims will be governed by the Consolidated Class Action (Medical Monitoring) Complaint and/or the Master Personal Injury Complaint, to be filed by August 22, 2022, pursuant to Pretrial Order #14 (ECF 573), and any additional Short Form complaints that may be filed (or as otherwise agreed by the parties).

## IX.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request, individually and on behalf of the Nationwide Class and State Subclasses, that this Court:

A.    Determine that the claims alleged herein may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Nationwide Class and Subclasses defined above, designate Plaintiffs as the class and subclass representatives as specified above, and designate Plaintiffs' counsel as counsel for the Nationwide Class and State Subclasses;

B.    Award equitable relief, including but not limited to ordering Philips to provide restitution and disgorgement of profits;

C.    Award all damages to which Plaintiffs and Class members are entitled;

D.    Award pre-judgment and post-judgment interest on all monetary relief;

E.    Award reasonable attorneys' fees and costs; and

F.    Grant such further and other relief that this Court deems appropriate.

## X.    JURY DEMAND

Plaintiffs and the Class demand a trial by jury on all issues so triable.

Dated: September 8, 2022

Respectfully submitted,

**RIVERO MESTRE LLP**
*Counsel for MSP*
2525 Ponce de León Blvd., Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Facsimile: (305) 445-2505
E-mail: jmestre@riveromestre.com
E-mail: zkass@riveromestre.com
E-mail: afernandez@riveromestre.com
Secondary: npuentes@riveromestre.com

/s/ *Jorge A. Mestre*
JORGE A. MESTRE (*pro hac vice* pending)
Florida Bar No. 088145
ALAN H. ROLNICK (*pro hac vice* pending)
Florida Bar No. 715085
SCHNEUR Z. KASS (*pro hac vice* pending)
Florida Bar No. 100554
AMANDA L. FERNANDEZ (*pro hac vice* pending)
Florida Bar No. 106931

/s/ *Janpaul Portal*
Janpaul Portal, Esq. (*pro hac vice* pending)
Florida Bar No. 0567264
**MSP RECOVERY LAW FIRM**
*Counsel for MSP*
27701 S. Le Jeune Road, 10th Floor
Coral Gables, FL 33134
(305) 614-2222
jportal@msprecoverylawfirm.com
*Pro hac vice pending*

/s/  *Charles E. Schaffer*
Sandra L. Duggan, Esquire
Charles E. Schaffer, Esquire
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500

117

Philadelphia, PA 19106
(215)592-1500 (phone)
(215)592-4633 (fax)
sduggan@lfsblaw.com
cschaffer@lfsblaw.com

*/s/ Christopher A. Seeger*
Christopher A. Seeger, Esquire
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
(973) 639-9100 (phone)
cseeger@seegerweiss.com

*/s/ Kelly K. Iverson*
Kelly K. Iverson, Esquire
**LYNCH CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
(412) 322-9243 (phone)
kelly@lcllp.com

*/s/  Steven A. Schwartz*
Steven A. Schwartz, Esquire
**CHIMICLES SCHWARTZ KRINER &
DONALDSON-SMITH LLP**
361 West Lancaster Avenue
One Haverford Centre
Haverford, PA 19041
(610) 642-8500 (phone)
steveschwartz@chimicles.com

118